[Sac. No. 7750.   In Bank.   Dec. 13, 1966.]

GORDON STROMER, Plaintiff and Respondent, v. J. L. BROWNING, Defendant and Appellant.

Downey, Brand, Seymour & Rohwer, Devlin, Diepenbrock, Wulff & Plant, Diepenbrock, Wulff & Plant and Ronald N. Paul for Defendant and Appellant.

James G. Changaris and Malcolm A. Misuraca for Plaintiff and Respondent.

McCOMB, J.—Defendant appeals from a judgment in favor of plaintiff, after a nonjury trial, in a suit to recover a broker's commission for the sale of real property.

*Facts*: In June 1958 defendant gave plaintiff, a broker, oral authority to find a buyer for a 2200-acre ranch which defendant owned, excepting therefrom 73 acres which he planned to use as a duck club. A 5 percent commission was fixed.

Plaintiff drew up a descriptive brochure, and defendant gave him the names of several prospects.

In September 1958 the Wilbur brothers submitted a purchase offer for $475,000 through plaintiff.

On September 24, 1958, defendant delivered to plaintiff a written counteroffer to sell the property to the Wilburs for $500,000. The counteroffer, which was addressed to plaintiff and signed by defendant, contained a specific reference to plaintiff's commission, reading, "Your commission for consummating said sale shall be 5% of the gross purchase price, payable 5% of each principal payment within 10 days after my receipt of the same. . . ." This counteroffer was rejected.

On October 10, 1958, the Wilburs, plaintiff, defendant, and defendant's attorney (Mr. Wulff) had a conference, and Mr. Wulff took notes of the negotiations between the parties in order to reduce the understandings to writing later.

Defendant testified that at the conclusion of the meeting all terms of the sale were "clear" in his mind, and Mr. Roger Wilbur testified that the parties reached an agreement at the meeting. Under the formula set, the purchase price would have been $545,000 at 2½ percent interest.[1] All agreed, however, that the parties were not to be bound until each had approved and executed the sales documents to be prepared by Mr. Wulff. Earlier the Wilburs had deposited $10,000 in escrow.

The trial court found that at the October 10 meeting the parties agreed that the center line of a levee would be the south boundary of the duck club acreage defendant was

---

[1] The Wilburs had indicated a willingness to pay $490,000 at 5 percent interest, but agreed that the figure could be changed to reflect a lower rate of interest and a higher amount of principal, in order to give defendant a tax advantage.

retaining and that water flowing through a 30-inch pipeline which extended through the levee would be available for the needs of the Wilburs (who also proposed to establish a duck club) after defendant's duck pond reached a designated level.

It was understood that the terms of the agreement with respect to the use of the pipeline would be incorporated in a written water use agreement to be prepared by defendant's attorney and delivered to the escrow depositary.

On October 14, 1958, defendant delivered a key to the ranch to Roger Wilbur, who wished to begin building blinds for the imminent duck hunting season. Defendant also suggested that Mr. Wilbur, rather than defendant, sign a proposed contract for the sale of certain rock from the ranch, since the Wilburs were to purchase the property. Mr. Wilbur signed the contract and also posted the property against trespassers and built four duck blinds on it. Defendant testified that on October 14 the deal with the Wilburs was "consummated."

Shortly after the October 10 meeting, defendant's attorney became ill, and there was a delay in the preparation of the papers respecting the transaction. In the meantime, since the duck hunting season had begun, defendant authorized the Wilburs to proceed with the filling of their proposed duck pond. While it was being filled, however, defendant discovered that the water level in his own pond was dropping, and he turned off the water. Thereafter, defendant directed his attorney to draft the water use agreement in such a way that defendant would have virtual control over the water supply.

The documents prepared by Mr. Wulff were delivered to the escrow depositary in November. Included was a typed form of brokerage fee contract designed for the signatures of plaintiff and defendant and actually signed by defendant. It stated, in part: "WHEREAS, the Seller has agreed to pay to the . . . Broker . . . a five percent (5%) commission of the purchase price as, if and when he receives the same.

"Now, THEREFORE, IT IS AGREED . . . :

"1. That the Seller hereby agrees to pay to the . . . Broker as and for his services in procuring such purchaser a sum equivalent to five percent (5%) of said purchase price actually received by Seller, which payments shall be made within five (5) days from and after Seller's receipt thereof, that is, either the initial payment or any subsequent installments thereof."

Instead of the levee center line, the papers specified a boun-

dary line 20 feet south thereof, where defendant had had survey stakes placed. Instead of the agreed provision for a water supply, the papers would have provided the Wilburs a right only to water considered excess to defendant's needs.

The Wilburs refused to sign, instructed plaintiff to tell defendant the deal was off, and told their attorney to withdraw the $10,000 deposit from the escrow.

The trial court found that plaintiff and defendant entered into an oral contract by which plaintiff would receive a 5 percent commission "as, if and when" the sale proceeds were received by defendant; that defendant thereafter signed two separate written memoranda acknowledging employment of plaintiff and his promise to pay a commission; that plaintiff procured the Wilburs as buyers; that at the October 10 meeting the parties entered into an "oral contract" of sale and agreed upon all its terms, with nothing remaining to be done except to prepare and execute the necessary documents; and that the Wilburs remained ready, willing, and able to buy, but defendant breached the oral contract and refused to convey to the Wilburs on the agreed terms and also "breached his oral contract" to pay plaintiff a 5 percent commission.

Judgment was entered in favor of plaintiff for $27,250 principal and $9,669.75 interest, together with interest on the total sum from the date of the judgment.

Question: *Is plaintiff entitled to a commission even though the sale was never consummated?*

*No.* ■ Where a broker's contract provides that he will be entitled to a commission only upon consummation of a sale, he will ordinarily not be entitled to a commission unless a sale is consummated. (*Cochran* v. *Ellsworth,* 126 Cal.App.2d 429, 439-440 [272 P.2d 904]; *Peak* v. *Jurgens,* 5 Cal.App.2d 573, 576-577 [1] [43 P.2d 569].)

■ A prospective seller, however, owes a duty to the broker not to act arbitrarily or in bad faith to prevent consummation of the transaction where the broker has found a prospective buyer who is ready, able, and willing to purchase the property, and the prospective buyer and the prospective seller have agreed upon the terms and conditions of the sale. (*Coulter* v. *Howard,* 203 Cal. 17, 23 [3] [262 P. 751]; *Turner* v. *Waldron Realty,* 209 Cal.App.2d 376, 385 [6] [25 Cal.Rptr. 771].)

■ Under such circumstances, if a sale is not consummated because the seller, acting arbitrarily or in bad faith, prevented consummation, the broker is entitled to his commission even though his contract provides that payment shall be

made out of the proceeds of the sale (*Coulter* v. *Howard, supra,* 203 Cal. 17, 23 [3]; *Realty Bonds etc. Co.* v. *Point Richmond etc. Co.,* 171 Cal. 238, 240-241 [152 P. 433]; *Ratzlaff* v. *Trainor-Desmond Co.,* 41 Cal.App. 586, 592-593 [183 P. 269]) or upon successful completion of the escrow (*Turner* v. *Waldon Realty, supra,* 209 Cal.App.2d 376, 385 [6, 7]).

In *Coulter* v. *Howard, supra,* 203 Cal. 17, the seller signed escrow instructions, which included provision for payment to plaintiff broker of a 5 percent commission ''at close of escrow but only out of funds then due and payable to me out of this escrow.'' (P. 20.) Thereafter, the seller repudiated the transaction and sold the property for a higher price to another buyer at a time when his contract with the prospective buyer found by the broker was not enforceable, the latter not having complied with certain conditions included in the escrow instructions, of which he was unaware until the time for compliance had expired.

It was held that the seller, having failed to act with the required good faith, was liable to the broker for his commission, the court saying, ''The law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase.'' (P. 23 [3].) It was pointed out, at page 25 [6], that it was not necessary that a binding contract be executed by the prospective buyer.

In *Realty Bonds etc. Co.* v. *Point Richmond etc. Co., supra,* 171 Cal. 238, the contract provided that the broker would be paid a 25 percent commission, payable 10 percent out of the first payment and half of all other payments until the commission was paid in full, as a result of which the broker would have received its full commission as soon as 40 percent of the total price had been paid.

It was held that although ordinarily under such a contract the broker would not be entitled to the whole commission until 40 percent of the total price had been paid, plaintiff broker was entitled to recover the full commission under the circumstances of the case, it having been shown that the sellers had refused to make certain improvements which they were obligated to make by the terms of the contracts of sale, and as a result many buyers had defaulted in their payments, and that the sellers had also notified a number of the buyers that the broker was no longer authorized to receive payments under the contracts.

Similarly, *Ratzlaff* v. *Trainor-Desmond Co., supra,* 41

Cal.App. 586, involved a brokerage contract calling for payment of commissions from the proceeds of sale. By transferring its right to the proceeds to a third party, the seller defeated the broker's claim on them. It was held that the broker was nevertheless entitled to recover the amount of his commission from the seller, the court finding that the latter had not acted with the required good faith.

In *Turner* v. *Waldon Realty, supra,* 209 Cal.App.2d 376, the sellers agreed in writing to sell a 7½ acre parcel of land to a prospective buyer named Fether. The parties later orally agreed that an additional two acres would be included in the sale. While an application for a variance submitted by the parties to the planning commission was pending, the sellers sought to rescind. Fether asserted his reliance upon both the written agreement and the oral negotiations, but asserted his intention to enforce the former even if he was unable to enforce the latter.

In the meantime, the sellers, who owned a total of 47 acres, had been negotiating with another buyer and subsequently sold the 47 acres to him, including the 9½ acres Fether wanted to buy. Prior to consummation of the sale, Fether brought an action for specific performance, and the sellers later paid him $7,000 in compromise.

It was held that even though the agreement was to pay a commission upon "successful completion" of the escrow provided for in the written contract to purchase and sell, the sellers could not urge noncompletion to defeat recovery of the agreed commission, in view of the fact that such noncompletion was brought about by their refusal to proceed. (P. 385 [7].)

It was also pointed out that the fact that part of the agreement between the prospective buyer and sellers may have been oral and therefore unenforceable would not be a defense to the sellers' obligation under the listing contract. (P. 384.)

In *Cochran* v. *Ellsworth, supra,* 126 Cal.App.2d 429, although the court uses language suggesting that the seller had not acted in good faith (p. 439), it will be observed that the buyer gave notice of rescission and that the seller promptly instituted an action for specific performance against him. Thereafter, following negotiations through their attorneys, the parties mutually agreed to rescind the transaction. Since the buyer was unwilling to proceed, the seller, by eventually agreeing to rescind the transaction, cannot be said

to have acted with the bad faith which would make him liable for the commission.

In the present case, even if we assume that by changing the terms orally agreed upon, defendant caused the buyers to refuse to enter into a binding contract, it would appear that his actions were nevertheless consistent with the good faith which the law requires of him.

In the first place, the record shows that after orally agreeing on the terms of sale, the parties agreed no one would be bound until all had approved and executed documents of sale. Accordingly, it would appear that defendant's actions in changing the terms of the so-called ''oral contract'' do not necessarily evidence a lack of good faith.[2]

In addition, the evidence shows that defendant's duck club was of primary importance to him and that he was unwilling to sell the ranch unless he could retain the duck club. Plaintiff himself testified, ''Mr. Browning [defendant] told me at the time, at this very first meeting, there was definitely no chance at all of selling the ranch unless he retained approximately 70 acres in the northeast corner for duck hunting for his own self.''

With respect to the alleged 20-foot change in the boundary, defendant testified that the parties did not orally agree on the boundary at the October 10 meeting; that the boundary was to be determined by survey; and that in order to assure proper maintenance of the levee, it was necessary for him to retain a strip of land in the so-called bean field to use for borrow in case there was a wash in the levee.

As indicated above, after the oral agreement with the prospective buyers was made, it became apparent to defendant that if the transaction were completed on the terms orally agreed upon, he would not have the full use of the facilities of

[2]The so-called ''oral contract'' was, of course, unenforceable by virtue of the statute of frauds. (Civ. Code, § 1624, subd. 4.) Whether there had been sufficient part performance to take it out of the statute of frauds, as plaintiff contends, is immaterial in view of the parties' agreement that no one would be bound until written documents were executed. The parties having negated their intent to be bound until a writing was executed, there was no ''oral contract'' which part performance could make enforceable. (*Spinney* v. *Downing*, 108 Cal. 666, 668-669 [41 P. 797]; *Kessinger* v. *Organic Fertilizers, Inc.*, 151 Cal.App.2d 741, 749-750 [312 P.2d 345].)

The question with which we are here concerned, however, is not whether the contract was enforceable, but whether defendant acted in good faith in making the above mentioned changes, as a result of which the prospective buyers refused to bind themselves to complete the transaction.

his duck club; and it is clear that any variations in the oral understanding and the written documents delivered to the escrow depositary were made at defendant's direction for the purpose of assuring that he would have full use of the facilities of the club.

Defendant owed plaintiff a duty to act in good faith, even though he was not legally bound under the agreement with the prospective buyers. However, when it developed after the oral agreement was made that if the transaction were completed on the terms orally agreed upon, defendant would not have the full use of the facilities of his duck club, he was not required to consummate the transaction in order that plaintiff would not be deprived of his commission.

As stated above, defendant had informed plaintiff at the time he authorized him to look for a buyer that he would not sell the ranch if he would thereby be deprived of his duck club; and his action in making the above mentioned changes in the papers submitted to the escrow depositary, for the purpose of assuring that he would have the full use of the club, does not show a lack of good faith.

Under the circumstances, plaintiff is not entitled to recover his commission.

It is unnecessary to decide other questions raised by defendant.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied January 25, 1967.