[Civ. No. 29384. Second Dist., Div. Four. Feb. 15, 1967.]

THE COLWELL COMPANY, Plaintiff and Appellant, v. FRANK D. HUBERT, Defendant and Appellant.

Lloyd F. Dunn for Plaintiff and Appellant.

Milton Zerin and Morton Minikes for Defendant and Appellant.

FOX, J.*—This case grows out of a letter agreement relative to brokerage fees for the asserted procurement by plaintiff of a food market as a lessee in a shopping center that defendant Hubert proposed to build. The initial judgment was for $46,200 damages, plus interest and costs. Upon motion for a new trial the judgment was vacated and a new judgment was entered for $34,650, plus interest and costs. Defendant Hubert has appealed from the judgment as reduced. Plaintiff has cross-appealed from that portion of the revised judgment which reduces the award from $46,200 to $34,650.

### DEFENDANT'S APPEAL

In the fall of 1959 defendant was in the process of developing a shopping center in the Sunland-Tujunga region of Los Angeles County which he called Sunhill. He was particularly interested in securing a major food market chain as a tenant, specifically Food Giant Markets, Inc. All the markets he had contacted, however, turned down defendant's location.

As a result he had not been able to arrange financing for the shopping center. In October 1959 defendant consulted plaintiff with respect to securing necessary financing and for the purpose of negotiating a lease with a food market chain. Defendant was referred to Donald G. Finley, manager of plaintiff's commercial loan department. Defendant informed Finley that he was having difficulty obtaining leases on the improvements he proposed to build on the Sunhill site and mentioned that he had attempted to interest Food Giant in establishing a supermarket in his proposed shopping center but had been unsuccessful. Finley informed Hubert that he was familiar with the Sunhill site and the area surrounding it and that he had had previous dealings with Food Giant, was well acquainted with its top executives, and believed he could interest that company in leasing a portion of said proposed improvements, and that he would make a preliminary investigation to ascertain if Food Giant would reconsider defendant's site.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

Food Giant informed Finley it would reconsider this location, and Finley so informed Hubert.

Finley then made a preliminary investigation of population growth, competition, purchasing power of the area, and took aerial photographs. He concluded that Sunhill had a good potential for a food market. After some discussion with defendant, Finley, on November 2, 1959, prepared a letter memorandum[1] which was signed by Hubert which in substance and effect authorized plaintiff to obtain for Hubert a lease from Food Giant Markets, Inc. covering a portion of the proposed shopping center development by Hubert, including construction of a market building.

During the next two weeks Finley, in cooperation with Hubert, gathered and collected factual data concerning the Sunhill site and the improvements to be constructed thereon and prepared a formal booklet thereof for presentation to Food Giant. Finley had conferences with the representatives of Food Giant and made a preliminary presentation of the data he had collected regarding the location. The representatives of Food Giant expressed their interest in the shopping center and in leasing a portion of said proposed improvements. When the complete data had been collected Finley met with officials of Food Giant and presented to them the completed picture of the location and the proposed development and the suggestions he had discussed with Hubert relative to rental terms. The officials of the company offered to lease a portion of the improvements that Hubert planned to develop on the Sunhill site upon rental terms substantially the same as those that Finley had previously discussed with Hubert. Finley thereupon informed Hubert of this meeting with the officials of Food Giant and the results thereof.

---

[1] "November 2, 1959. Mr. Hubert. re: Sunhill Shopping Center. Dear Mr. Hubert: In accordance with our previous conversation I have made a preliminary study to determine what degree of interest we might have in undertaking the leasing of a super market building to Food Giant Markets, Inc. I have subsequently concluded that there is a definite need for a super market in the general area and that supported by a community shopping center containing a national variety and drug store, a Food Giant Market would do well in your location.

"I am now working on a detailed analysis necessary to the successful leasing of a project of this type. I expect to be able to make a formal presentation to Food Giant in the latter part of next week.

"The acceptance of the attached carbon copy of this letter will serve as our exclusive authorization to provide such leasing on terms and in amounts subject to your approval. Our leasing fee is to be consistent with the Los Angeles Realty Board's schedule of commissions. Sincerely yours, Donald G. Finley, Manager, Commercial Loan Department. Accepted: Date: November 2, 1959, by Frank D. Hubert."

In early December 1959 Finley prepared a form of lease and submitted copies thereof to both Food Giant and Hubert for their consideration. Prior to December 21, 1959, plaintiff had secured an oral offer from Food Giant that it would enter into and execute a lease in the form submitted by plaintiff through its agent Finley. Shortly thereafter and prior to December 21, 1959, Finley informed Hubert of Food Giant's oral offer. Hubert thereupon set up an appointment for Finley and himself with Hubert's lawyer, Gerald Bridges, Esq., for the purpose of considering said proposed form of lease. This meeting was held with Bridges at his office on December 21, 1959. With respect to this meeting, Finley testified as follows:

"A Mr. Bridges thumbed through the lease in our presence. He indicated that he had previously been busy; he hadn't had a chance to go over it. He had been sick or something. He reviewed the lease while we were there, and he brought up some questions of phraseology that he would prefer to change, and asked me if I thought Food Giant would have any objection to it or to his objections as they came along, and I said, no, I didn't think that they would be of consequence, and I was assured that Food Giant wouldn't object to them, and it was determined then—I don't know whether it was at the suggestion of the attorney or Mr. Hubert, but that his suggestions for changes be written out, and provided me, so I could go back to Food Giant, and make absolutely sure that they would be acceptable to Food Giant, but before we got to the point of his actually drawing them, I wanted to be sure again that we weren't wasting time, and so I turned to Mr. Hubert, who was on my right, and asked him, I said, 'Once again, I want to confirm that the terms that we have been discussing all the time are still acceptable to you, and that the general content of the lease form here, subject to Mr. Bridges' corrections, are acceptable to you, and, if they are, as soon as you provide me with that, I will go back to Food Giant and see if I can get their approval to it, which I am sure I can.'

"Mr. Hubert said, 'Yes. That will be fine.' "

In this connection Finley further testified:

"Q What happened after that?

"A Nothing. I waited for approximately a week. He was supposed to get them out to me just immediately, and I expected them in a matter of a few days, and I didn't get them, and I waited a little longer, and I called Mr. Bridges, and didn't get through, and I wanted [sic] a little bit longer, and called again, and didn't get through.

"Well, I just never got anything. I called Mr. Hubert, and

asked him about it, and I don't remember any of the conversations, except that I didn't get any of the suggested changes, and I finally kept pestering Mr. Bridges until I got through to him, and he indicated that he was no longer Mr. Hubert's attorney.''

Based principally upon this testimony, the trial court found that: ''. . . neither HUBERT nor his lawyer made any specific objection to said form of lease, or to any provision thereof, nor did they propose any specific change in the terms thereof.'' (Find. 15.) The court further found: ''On said December 21, 1959 plaintiff and HUBERT entered into a supplemental oral contract whereby, in substance and effect, HUBERT agreed that the general content of said form of lease was acceptable to him, and he approved the same; HUBERT agreed that he would promptly inform FINLEY of any corrections or changes he desired in the wording or provisions of said form of lease; and plaintiff agreed that, upon being informed of said corrections or changes, it would submit them to Food Giant and would use its best efforts to obtain Food Giant's approval thereof.'' (Find. 16.)

█ Following the meeting of December 21, 1959, between Finley, Hubert, and the latter's lawyer in which it was agreed that any changes in the phraseology of the proposed lease would be submitted to Finley in writing by Hubert or his attorney, Hubert telephoned his attorney's office on January 7, 1960, and left a message asking him to please return the Food Giant lease. During the early part of January 1960, Finley called Hubert inquiring as to when he would receive the suggested changes in the phraseology of the proposed lease. Hubert advised him that they were being prepared, that he would get them from Bridges.

On February 10, 1960, Hubert wrote Finley stating he would go over the proposed lease with his lawyer and supply written objections to the lease. However, he failed to advise Finley of any objections. In that same letter Hubert attempted to get plaintiff to accept one-half of the agreed commission for negotiating the proposed lease with Food Giant. In an attempt to resolve defendant's request for a reduction in the agreed commission, Finley set up two appointments for Hubert with Robert Morgan, executive vice-president of plaintiff. But Hubert neither kept nor cancelled either of these appointments—he just failed to show up. On March 24, 1960, Hubert wrote to Finley cancelling the letter agreement of November 2, 1959.

In January 1961 Hubert employed another attorney in con-

nection with this matter. A lease was executed by and between Hubert and Food Giant on February 13, 1961. The court found that: "Plaintiff, at all times after December 21, 1959, was ready, willing and able to proceed to perform its part of said written agency contract and said supplemental oral contract and to do all things necessary to carry out its agency under said contracts." (Find. 18.)

The court further found that: "HUBERT, by not informing plaintiff of any specific changes or corrections he desired in the terms, wording or provisions of said form of lease, prevented plaintiff from performing said written agency contract and said supplemental oral contract, and he thereby breached each of said contracts." (Find. 23.)

The court also found: "Defendant acted in bad faith with regard to each of said contracts after December 21, 1959." (Find. 24.)

And, finally, the court found: "Plaintiff performed all the obligations imposed upon it by each of said contracts until further performance on its part was impossible by reason of the acts and conduct of HUBERT, and plaintiff was at all times ready, willing and able to perform any and all additional obligations imposed upon it under the provisions of said contracts if it had not been prevented by acts and conduct of HUBERT." (Find. 28.)

It is plaintiff's position that at the meeting of Finley, Hubert and Bridges in the latter's office on December 21st, plaintiff and defendant entered into a supplemental oral contract in which Hubert agreed to the general content of the form of lease submitted to him by plaintiff and approved the same in principle but with some possible revision of the language; that he would inform Finley of any changes in the phraseology desired by him; and that Finley would thereupon submit the suggested revision of the language to Food Giant, and use his best efforts to obtain Food Giant's approval, thereof. In other words there was an agreement on the basic terms of the lease, but the language that was used was subject to some possible revision. This position of plaintiff finds support in Finding 16, quoted *supra*, and in the testimony of Finley quoted above, where he turned to Hubert and said to him: "Once again, I want to confirm that the terms that we have been discussing all the time are still acceptable to you, and that the general content of the lease form here subject to Mr. Bridges' corrections are acceptable to you . . ." and Hubert replied: "Yes. That will be fine."

Plaintiff emphasizes that Hubert never submitted any proposed changes in or revisions of the language used in the lease; that some two and one-half weeks later Hubert requested his attorney, Bridges, to return the Food Giant lease; that in early February 1960 defendant sought a 50 percent reduction in plaintiff's brokerage fee; and although Finley made two appointments for Hubert to discuss this matter with plaintiff's executive vice-president, Hubert failed to keep either of these appointments and did not cancel either of them or make any explanation for his failure to keep them. Then, on March 24, Hubert attempted to cancel the agency agreement with plaintiff.

The court found that defendant acted in bad faith with regard to each of said contracts after December 21, 1959, and that the acts and conduct of Hubert made it impossible for plaintiff to carry out said agreements after that date. The above evidence with the inferences that the trial court reasonably could draw therefrom amply supports these findings.

Defendant argues that the letter agreement of November 2, 1959, was an ''agreement to agree,'' was incomplete on its face, and plaintiff can predicate no claim to a commission thereon in the absence of a subsequent agreement. The simple answer to that argument is contained in Finding 16 which found there was a subsequent agreement on December 21 in which Hubert did agree to the terms and conditions as embodied in the proposed form of lease, subject to some possible revision in its phraseology that he might desire but which he never did, in fact, supply though requested to do so.

Defendant argues that Finding 15, the essential portion of which is quoted above, is not supported by the evidence. This finding is based principally on the testimony of Finley, quoted *supra*. His testimony was to the effect that Bridges, Hubert's attorney, brought up some questions of phraseology in the form of lease which Finley indicated were not of any particular consequence; that it was agreed that any suggested revision in phraseology would be submitted in writing by defendant or his attorney so that Finley could submit it to Food Giant for approval. No specific written objections, corrections or changes in phraseology were thereafter submitted by defendant or his attorney. In fact, Bridges was requested by defendant to return the lease to him on January 7, 1960. The foregoing testimony, together with the inferences reasonably to be drawn therefrom, adequately support the challenged finding.

Defendant Hubert argues that he was under no duty or obligation to make any counteroffer to the proposed form of lease submitted to him by plaintiff and that it was not bad faith to fail to do so. Defendant ignores the court's finding of a supplemental oral contract in which the basic terms of the lease were agreed upon and attempts to treat the acceptance in substance as a rejection. The stage of offer and counteroffer was concluded by the oral agreement; only the possible revision of some of the phraseology remained to be worked out, but even that did not materialize.

With respect to the finding that Hubert acted in bad faith, it is quite apparent from the evidence, facts and circumstances herein referred to and the inferences reasonably to be drawn therefrom (without going into specific detail) that there is ample evidentiary support for the challenged finding.

This finding that defendant acted in bad faith brings into focus the well established principle that, ''In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.'' (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665] ; *Brown* v. *Superior Court*, 34 Cal.2d 559, 564 [212 P.2d 878] ; *Van Houten* v. *Whitaker*, 169 Cal.App.2d 510, 516 [337 P.2d 900].) ''This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose. [Citations.]'' (*Harm* v. *Frasher*, 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367].) The application of this principle to the established facts in the case at bench furnishes a solid foundation for defendant's liability. For the failure of defendant to inform plaintiff of any specific change in the phraseology of the form of lease prevented plaintiff from performing the written agency contract of November 2, 1959, and the supplemental oral contract of December 21, 1959, and made it impossible for plaintiff to effectuate the lease and excused performance on plaintiff's part. This conduct of defendant clearly constituted a breach of said contracts under the principles stated in the cases cited above.

Apposite here is the recent statement of the Supreme

Court in a suit to recover a broker's commission for the sale of real property in *Stromer* v. *Browning,* 65 Cal.2d 421, 424 [55 Cal.Rptr. 18, 420 P.2d 730]; "A prospective seller, however, owes a duty to the broker not to act arbitrarily or in bad faith to prevent consummation of the transaction where the broker has found a prospective buyer who is ready, able, and willing to purchase the property, and the prospective buyer and the prospective seller have agreed upon the terms and conditions of the sale. [Citations.]

"Under such circumstances, if a sale is not consummated because the seller, acting arbitrarily or in bad faith, prevented consummation, the broker is entitled to his commission even though his contract provides that payment shall be made out of the proceeds of the sale [citations] or upon successful completion of the escrow [citation]."

In *Coulter* v. *Howard,* 203 Cal. 17, the court stated at page 23 [262 P. 751]: "The law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase. [Citations.]" These principles, of course, apply equally to a prospective lessor in his dealings with his broker, and support the trial court's conclusion that plaintiff is entitled to recover in this case.

 Defendant challenges the sufficiency of the evidence to support the latter portion of Finding 27 which reads: ". . . said lease [dated February 13, 1961] was a consummation of the negotiations initiated by plaintiff and plaintiff was the procuring cause of said lease." In support of this finding it will be recalled that Hubert was having difficulty in obtaining leases for his proposed shopping center prior to entering into the November 2, 1959, agency agreement with plaintiff; that Finley induced Food Giant to reconsider Hubert's proposed Sunhill site after its earlier rejection when Hubert had tried to interest Food Giant in his Sunhill development; that Finley was instrumental in getting Food Giant to decide on locating one of its food stores in Hubert's Sunhill Shopping Center; that Food Giant made an oral offer to enter into and execute a lease in a proposed form submitted by Finley; that this proposed form of lease was agreed to in all essential respects by Hubert at a meeting in his attorney's office on December 21, 1959; that defendant failed and refused to carry out the supplemental agreement of December 21, 1959, and by his course of conduct made it impossible for plaintiff to effectuate said lease. On March 24, 1960, defendant cancelled the agency agreement with plaintiff, and in early June 1960 was in direct

contact with Food Giant attempting to work out a lease for the identical food store here in question.[2]

From the facts mentioned above there can be no doubt that the lease of February 13, 1961, ''was a consummation of negotiations initiated by plaintiff.'' Was plaintiff the procuring cause of said lease? In *Chamberlain* v. *Abeles,* 88 Cal.App.2d 291 [198 P.2d 927], the court pointed out that to be entitled to his commission as the procuring cause, the agent does not necessarily have to consummate the transaction. ''The word 'procure' does not necessarily imply the formal consummation of an agreement. . . . The originating cause, which ultimately led to the conclusion of the transaction is held to be the procuring cause. [Citations.] . . . And where the evidence is conflicting, the conclusion as to the procuring cause is one for the trial court and will not be disturbed on appeal.'' (*Brea* v. *McGlashan,* 3 Cal.App.2d 454, 465 [39 P.2d 877].) The foregoing principles are approved in *Willson* v. *Turner Resilient Floors,* 89 Cal.App.2d 589, 595 [201 P.2d 406], and *Rose* v. *Hunter,* 155 Cal.App.2d 319, 323 [317 P.2d 1027]. ■ Here the evidence as to the procuring cause was in conflict. The trial court has resolved that conflict in favor of plaintiff. Such resolution is, of course, binding on appeal.

Defendant argues that plaintiff's agency authorization was not enforceable beyond a reasonable time and was subject to revocation after such reasonable time; and that it was incumbent on plaintiff to establish that at the time of the consummation of the lease on February 13, 1961, its agency had not terminated by reason of the lapse of a reasonable time. This argument had no relevance whatever in the factual context at hand. It will be recalled that early in December 1959 Finley, after consultations with both Hubert and Food Giant, prepared and submitted a proposed form of lease for consideration by each of them; that prior to December 21 Food Giant offered, through Finley, to enter into and execute the proposed form of lease; that on December 21 Hubert entered into the supplemental agreement, accepting and approving the essential terms of the proposed lease, subject to such changes in phraseology as he or his attorney might suggest in writing; that no changes were suggested by either of them although requests therefor

---

[2]In a letter dated June 8, 1960, addressed to Mr. Gold of Food Giant (''Re: Sunhill Plaza Shopping Center, Sunland'') defendant wrote (in part): ''I thank you for the nice reception you gave me and the lengthy time you took to go over this matter. I appreciate the sincerity and willingness you are handling this *prospective lease.*'' (Italics added.)

were made upon both of them by Finley; that by not informing plaintiff of any specific revision he desired in the form of lease defendant prevented plaintiff from performing both the agency contract and the supplemental contract, and defendant thereby breached each of said contracts; and that defendant acted in bad faith with regard to each of said contracts after December 21, 1959.

Defendant argues that the measure of damages used by the court is erroneous. He contends (1) that if a commission is due, plaintiff is either entitled to a commission based upon the proposed lease to which the court found he assented on December 21, 1959 (subject to possible changes in phraseology), or (2) the reasonable value of its services. In making this argument defendant overlooks the finding (27) that the lease of February 13, 1961, ''was a consummation of the negotiations initiated by plaintiff, and plaintff was the procuring cause of said lease.'' Since plaintiff was the ''procuring cause'' of the lease, it is entitled to the compensation therein provided for the broker.

### Plaintiff's Cross-Appeal

It will be recalled that the agency contract of November 2, 1959, provided that plaintiff's ''leasing fee is to be consistent with the Los Angeles Realty Board's schedule of commissions.'' (See footnote 1.) During the course of the trial counsel for the respective parties entered into a stipulation of fact as to the computation of commissions due plaintiff (if plaintiff prevailed) in accordance with the schedule of commissions of the Los Angeles Realty Board and arrived at the figure of $46,200 which the court, relying on the stipulation, adopted. After the judgment was entered counsel for defendant reexamined the basis upon which this computation had been made and came to the conclusion that an erroneous basis upon which to compute the commissions had been adopted.

A motion for a new trial was made in which counsel asked that he be relieved from the stipulation of fact erroneously entered into, that the judgment be vacated and the amount of the judgment be further considered by the court and a new judgment entered. Counsel filed an affidavit in support of his motion stating in detail the erroneous base upon which the computation of commissions was made. The court granted the motion.

A wide discretion is vested in the trial court in ruling on a motion to set aside a stipulation. (*Brown* v. *Superior*

*Court,* 10 Cal.App.2d 365 [52 P.2d 256].) We find no abuse of discretion in the court's ruling on this matter.

Without taking additional evidence the court examined the lease, dated February 13, 1961, and the Los Angeles Realty Board's schedule of commissions due at the time of consummation of said lease. Since the lease is a percentage lease with minimum guarantee,[3] paragraph 35(a) of the Los Angeles Realty Board Schedule of Commissions applies.[4] It reads:

"Percentage leases with minimum guarantee: At the time of consummation of lease a partial payment on account of commission should be made, based upon the minimum guaranteed rental, and the remainder of commission based upon the percentage rental should be payable in installments throughout the term of the lease at the time the percentage rental for each period of the lease is determined."

The phrase "minimum guaranteed rental" as used in this paragraph means the total minimum guaranteed rental to be paid under the lease for the entire term thereof. The schedule of fees set forth in paragraph 21A(b) is applicable since the lease is the originating cause of a new structure and the term thereof is more than five years (the term of this lease is 25 years). Under that paragraph leasing commissions are computed thus: "3% of the total rental for the first five years. 2% of the total rental for the balance of the term." Application of this formula to the minimum guaranteed rental over the entire term of the lease results in an earned commission of $34,650 which is then due. Hence, the revised conclusion of law (No. 10) and the new judgment in that amount. The trial court correctly computed the amount of the judgment to which plaintiff was then entitled.[5]

The judgment (entered on November 6, 1964) is affirmed. Each side will bear its own costs on appeal.

Jefferson, Acting P. J., and Kingsley, J., concurred.

---

[3]The minimum guaranteed rent is $63,000 per year.

[4]Since this lease is a percentage lease with a minimum guarantee, it is not truly either a "net rental" or a "gross rental" lease as those terms are defined in paragraph 1 of said schedule.

[5]In the interest of clarity the court added conclusions of law 11 and 12.

Conclusion of law No. 11 reads: "Said sum of $34,650.00 does not include any provision for additional commissions to which plaintiff may be entitled by virtue of the application of the Schedule of Commissions of the Los Angeles Realty Board to the Food Giant lease in connection with payments by the lessee in excess of the minimum guaranteed annual rental for taxes, insurances, other charges and excess percentage rental after February 13, 1961."

Conclusion No. 12 reads: "Determination of any such additional commissions is expressly excluded from this decision."