[No. C011963. Third Dist. Mar. 2, 1993.]

R. J. KUHL CORPORATION, Plaintiff and Respondent, v.
JOHN L. SULLIVAN et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post*, page 1593.

**COUNSEL**

Hefner, Stark & Marois, Joel S. Levy, Lori R. Mello, Bernard & Wood, Steven M. Bernard and David P. Bonaccorsi for Defendants and Appellants.

Trainor, Robertson, Smits & Wade, Stuart Lansing Smits, David E. Frank, Eisen & Johnston, Jay-Allen Eisen, Marian M. Johnston, Karen Leaf and Ann Perrin Farina for Plaintiff and Respondent.

**OPINION**

**BLEASE, Acting P. J.**—This is a defendants' appeal from a judgment after a court trial in an action for breach of contract to pay a real estate broker's

commission and for damages for interference with contract relations and conspiracy to interfere with contract relations. Defendant John L. Sullivan entered into a written agreement to pay a commission if he purchased property presented to him by R. J. Kuhl Corporation (Kuhl). Sullivan contracted to purchase such a property but terminated the contract before closing under an agreement which substituted defendant Henry Khachaturian as the purchaser and gave Sullivan an option to purchase one-half of the property from Khachaturian and indemnified Sullivan for one-half of any commission owed Kuhl.

The trial court ruled that Sullivan owed a commission under his contract with Kuhl. In the published portion of the opinion[1] we conclude that the trial court's ruling is correct. Sullivan's termination of the contract and the substitution of Khachaturian as purchaser and refusal to pay a broker's commission to Kuhl allowed him to obtain pecuniary benefits at Kuhl's expense. Where a commission is conditioned on completion of a purchase transaction the broker's principal cannot in these circumstances refuse to perform under the purchase contract and thereby obtain an economic advantage unfairly derived from the broker's services. To do so violates the implied covenant of good faith and fair dealing and *excuses* the nonoccurrence of the condition.

We will affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

In May 1985 Sullivan retained Kuhl as a real estate broker under a written contract drafted by Kuhl. The pertinent provisions of the contract are as follows. Kuhl is "to find" an approximately six-acre site for a retail auto dealership in Roseville "and/or negotiate [its] acquisition . . . the same to be accomplished prior to midnight of July 31, 1985." Sullivan agrees to pay Kuhl "as compensation for finding and negotiating the purchase of a property acceptable to [Sullivan] a fee of Six percent (6%) of the purchase price." In the alternative, if Sullivan obtains an option on such a property he will pay a fee of $1,000 plus the balance of 6 percent of the purchase price if the option is exercised or assigned prior to its expiration. A condition for such payment is that Sullivan or "any person acting in [his] behalf purchases, obtains an option for . . . any property within one (1) year after termination of this [brokerage contract], which property [Kuhl] presented or submitted to [Sullivan] during the term [thereof]." Sullivan's "cooperation" is

---

[1]The Reporter of Decisions is directed to publish the opinion except parts II through VIII of the Discussion.

required as follows. "After execution of an accepted purchase, option, or lease agreement, [Sullivan] in a timely manner shall deposit in escrow or otherwise furnish all documents necessary to complete the transaction." Any commission paid to Kuhl by the seller would be subtracted from that owed by Sullivan.

Kuhl presented or submitted a 13.92-acre property owned by Sacramento Savings Bank to Sullivan within the term of the brokerage contract. Sullivan was interested, despite the size of the parcel, as he contemplated splitting the acreage after he acquired it, using one-half for his dealership, and selling the other half. Prior to July 31, 1985, Kuhl engaged in negotiations on behalf of Sullivan to purchase the property. Kuhl suggested that Sullivan offer $4,250,000; on July 22, Sullivan offered $3,950,000. Sacramento Savings counteroffered $4,550,000; Kuhl drafted a purchase contract at this price which called for Sacramento Savings to pay Kuhl a 5 percent commission.

However, no contract was reached prior to July 31, 1985. Thereafter, negotiations on behalf of Sullivan were conducted by his attorney, Walter Stockman. On September 3, 1985, Stockman sent a proposal to Sacramento Savings to purchase as follows, "$7.50 net per square foot (approximately 13.92 acres) or $4,547,664; and subtracting therefrom one-half of the principal bonded indebtedness on the property ([$139,200]) and the 5% commission on the property (that is $227,383) for a purchase price in the amount of $4,181,081."

On November 8, 1985, after numerous drafts of proposed agreements by Stockman, Sullivan and Sacramento Savings executed a contract for the sale of the property to Sullivan as follows. The purchase price is $4,181,081. The seller guarantees that bonded indebtedness will not exceed the $139,200 amount the letter of September 3d specified Sullivan would assume. "[Sullivan] will assume liability for any commissions which may be owing by [Sullivan] to R. J. Kuhl Corporation with regard to the purchase by [Sullivan] of the Property."[2] The escrow closure date is to be December 30, 1985. The close of escrow and Sullivan's obligation to purchase is conditioned on conveyance of marketable title, deposit of a survey into escrow, and certain

---

[2]Earlier drafts of the contract provided "Any and all commissions due to R. J. Kuhl Corporation as a result of the sale of said Property shall be paid by Buyer." Sullivan repeatedly testified at trial that he did not dispute Kuhl's entitlement to a commission if he had received title to the property upon consummation of the Sullivan/Sacramento Savings contract.

reasonable assurances to Sullivan concerning his ability to use the property promptly as an auto dealership.[3]

During the course of the Sacramento Savings negotiations Sullivan was also negotiating to sell the realty he presently used for his auto dealership to Khachaturian. They had agreed on a price and Sullivan anticipated using the proceeds of this sale to backstop the acquisition of the Sacramento Savings property. Prior to executing the contract to purchase that property Sullivan had discussed selling the half he would not use for his dealership to Khachaturian. On November 11, 1985, Stockman sent Khachaturian's counsel, James McKeehan, a letter proposing that Khachaturian and Sullivan enter into an agreement for purchase of the south half of the property after the parcel was split. One provision of the suggested agreement was that Khachaturian would be responsible for "one-half of any obligation Mr. Sullivan may incur with regard to commissions payable to R. J. Kuhl Corporation."

On December 27, 1985, Sullivan and Sacramento Savings executed an amendment of the contract of sale extending the date for closing to February 27, 1986. On February 3, 1986, McKeehan sent a letter to Stockman proposing that Khachaturian would acquire the Sacramento Savings property under the terms and conditions of Sullivan's contract and give Sullivan a one year option to purchase the half of the property that he desired. The consideration for the option was to be one-half of the monthly carrying cost of the seller's loan to be provided by Sacramento Savings. On February 6, 1986, Sullivan and Sacramento Savings executed another amendment to the contract extending the closing date to March 27, 1986.

---

[3]These assurances are as follows.

"4.4.3 *Reasonable Assurance.* Buyer, in the exercise of reasonable judgment but at his sole and complete discretion, shall assure himself that the following will be obtained within a reasonable period of time after close of escrow:

"i. *Engineering Test.* Determination by Buyer's soil test or civil engineers that all of said Property is free from filled ground or other geological or engineering conditions that would preclude its use and development in the usual and customary manner as a car dealership without extra expense for precautionary, corrective or remedial measures.

"ii. *Approval of Subdivision or Parcel Split.* Final approval of the plans and/or maps for subdivision or parcel split of said Property submitted by Buyer pursuant to Section 4.3 of this Agreement by all governmental agencies required to approve the same.

"iii. *Building Permit/Signage.* Issuance of a building permit and signage approval from the appropriate governmental agency for the construction of a car dealership (including ancillary services thereto and signage therefore acceptable to Buyer) on the northwestern half of the Property.

"iv. *General Motors Approval.* The approval by General Motors-Chevrolet Division or other agency whose approval of the site of a Chevrolet car dealership is required on the Property.

"v. *Financing.* The obtaining by Buyer of a commitment for construction financing for a car dealership on the Property adequate for the operation of John L. Sullivan Chevrolet."

On March 7, 1986, Stockman sent McKeehan copies of documents concerning Sullivan's purchase of the Sacramento Savings property. These included the brokerage contract and correspondence from Kuhl inquiring about payment of a commission. On March 14, 1986, Stockman sent McKeehan proposed documents to accomplish an assignment of the Sullivan/Sacramento Savings purchase agreement to Khachaturian and an option on half of the property to Sullivan.

McKeehan redrafted the documents. He was concerned that if Khachaturian obtained the property under an assignment of Sullivan's contract it would give credence to an argument that Khachaturian had assumed an obligation to pay a commission to Kuhl. McKeehan informed Khachaturian of his opinion that if Khachaturian bought the property there was no purchase by Sullivan and no commission was owed to Kuhl. McKeehan testified that the price to be paid by Khachaturian was "good" or "very low." He could not say whether Khachaturian would have bought the property if he believed the commission would have to be paid; he would only opine: "[t]hat would have thrown a serious monkey wrench into our transaction, one which I would have had to talk to [Khachaturian] at length about whether or not we would proceed under that scenario."

On March 24, 1986, the following occurred: Khachaturian and Sacramento Savings executed a contract, drafted by McKeehan, for purchase of the property whose essential terms parallel those of the Sullivan Sacramento Savings contract. Sullivan also subscribed this document under a provision asserting that he consented to it and that his earlier contract was "fully performed." Sullivan also gave a quitclaim deed to the property in favor of Khachaturian and his wife. Sullivan and Khachaturian executed a contract promising that if Kuhl made a claim for a commission they would jointly defend and that the costs of defense and resolution of such a claim would be borne equally.

On March 24th Sullivan and Khachaturian also executed an option agreement granting Sullivan an option for 12 months on the north half of the property, "In partial consideration of the assignment of [Sullivan's] interest in the [Sullivan/Sacramento Savings contract]." The first four months of the option cost Sullivan $100; retaining the option thereafter required a payment of $20,905 per month.

The next day, March 25th, Sacramento Savings conveyed the property to Khachaturian and his wife.

On April 18, 1986, Patricia Burgess, an attorney acting on behalf of Sullivan, sent a letter to Kuhl's counsel asserting that the Sullivan/Sacramento Savings contract was not consummated because of failure of "numerous conditions precedent to the consummation of the sale" contained in that

contract. Burgess contended in the letter that Kuhl's commission was contingent on consummation of the sale and there was no commission owed in light of the failure of that contingency.

On May 5, 1986, Kuhl filed this action, alleging Sullivan had breached the brokerage contract by failing to pay a commission, had fraudulently concealed the nature of the acquisition of the property by Khachaturian to avoid the payment of a commission, and had conspired with others to commit fraud. The complaint was subsequently amended to include Khachaturian as a defendant.

On July 31, 1986, Sullivan and Khachaturian executed a written contract for the termination of Sullivan's option. In return for the relinquishment of the option Khachaturian promised to defend and indemnify Sullivan against "any and all" claims asserted in this action. In August Khachaturian sold the half of the parcel that had been optioned to Sullivan to another buyer for $2.5 million.

Sullivan testified at trial that, "[k]nowing what I know today" but for Khachaturian's proposal to purchase the property and give an option to him, he: "would probably have gone through and purchased the property." However, he also said he did not know whether he would have done so at the time of Khachaturian's purchase.

The trial court ruled in favor of Kuhl, reasoning in essence, as follows in its tentative decision, which was subsequently adopted as its statement of decision.

"Counsel for Sullivan and [Khachaturian] argue that the final series of documents executed March 24, 1986, between [Khachaturian], Sullivan and Sacramento Savings were the result of a legitimate business decision of Sullivan to disengage from the transaction. Certainly there was evidence presented that suggests that as time went on, Sullivan became less and less interested in completing the transaction. It is equally clear that the sole purpose of the March 24, 1986, transaction was not to prevent Kuhl from receiving its commission. There is no question that [Khachaturian] wanted to buy the property from Sacramento Savings.

"Mr. McKeehan's testimony provided interesting insight into the commission issue. He indicated that there was concern, even reluctance, to renegotiate the Sacramento Savings transaction as [Khachaturian] came into the deal for fear of loosing [sic] it altogether. Accordingly, there was a concerted effort to retain the basic transaction between Sullivan and Sacramento

Savings and, where possible, to simplify it even further—to make it 'cleaner.' McKeehan, however, was very much aware of the commission issue and took steps to re-structure the transaction to avoid it. He realized that if the Sacramento Savings/Sullivan contract was simply assigned to [Khachaturian] there may be liability for a commission, a commission [Khachaturian] would be required to pay, at least in part.

"Sullivan's motives also seem clear. Although he may have had legitimate business reasons to step out of the Sacramento Savings transaction, he also wanted to retain an interest in the property, at least for the one year option period. By structuring the [Khachaturian]/Sullivan/Sacramento Savings transaction as was done on March 24, 1986, Sullivan was able to free himself from liability for the purchase of the entire 14 acres, and secured a one year option on the seven acres he really wanted. He also obtained an immediate economic advantage by eliminating liability for at least half (if not all) of the real estate commissions.

"It is clear to the court that the *substance* of the transaction between the defendants is that Sullivan had a fully negotiated deal with Sacramento Savings, that he wanted out of part of it, and that [Khachaturian] wanted to step into Sullivan's position. The parties were aware of the commission problem and attempted, by use of semantics, to avoid the liability created by an assignment of the original contract. The court will enter judgment in this case based on the substance of the transaction rather than the form unilaterally imposed by defendants. The court finds that the documents executed on March 24, 1986, effected an assignment of the Sacramento Savings/Sullivan transaction to [Khachaturian].

"The court finds that Sullivan is liable to Kuhl under the original retainer agreement because the 'assigned' contract became fully executed with the purchase of the property by [Khachaturian] and the securing of an immediate economic benefit by Sullivan through the option granted to him by [Khachaturian] and the agreement to pay half of the commission. The failure of Sullivan to pay the commission to Kuhl is a breach of the retainer agreement."

Khachaturian and Sullivan appeal from the ensuing judgment in favor of Kuhl.

DISCUSSION

I

Sullivan and Khachaturian argue that the only contract under which Kuhl may claim a commission is the brokerage contract but that it was not

breached because Sullivan did not complete the purchase transaction. Kuhl replies that a term of the brokerage contract is an implied promise that if Sullivan made a contract to purchase property submitted by Kuhl he would complete the transaction and that if he refused to do so without good cause he would be liable for the full commission. Kuhl points to a persuasive basis for upholding the trial court's finding and the contention of error is not meritorious.

At issue are Sullivan's legal obligations arising from the promises he made in the brokerage contract. ■ Since the contract is written its construction is a matter of law for independent determination by this court unless its meaning turns on extrinsic evidence that is in conflict. (E.g., *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) Both Sullivan and Khachaturian urge this view as a basis to overrule the trial court's finding the brokerage contract was breached. As appears, the extrinsic evidence is not material.[4]

■ A real estate brokerage contract is a contract for employment of an agent. Hence, "[t]he broker-principal relationship is governed by both agency and contract law . . . ." (Cal. Real Property Sales Transactions (Cont.Ed.Bar. 1981) § 2.18 (Sales Transactions).) The parties to a brokerage contract are at liberty to adopt provisions making compensation depend upon any lawful condition stated. (E.g., *Leonard* v. *Fallas* (1959) 51 Cal.2d 649, 652 [335 P.2d 665]; also see e.g., Sales Transactions, § 2.37.) The law of agency supplies terms regarding contingencies not addressed by the provisions of the contract. (See Rest.2d Contracts, § 5, subd. (2).)[5]

■ In the typical brokerage contract the prospective seller of the real property is the principal and the real estate broker is the agent. (See e.g., Sales Transactions, § 2.83.) In such a case the following general rules

---

[4]Sullivan testified at trial that he emphatically asserted to Kuhl's agent at the time of execution of the brokerage contract "that the only time I owe a commission is if I purchase the property" and that the agent assured him "that's right." Sullivan and Khachaturian point to this as uncontroverted extrinsic evidence of the meaning of the contract regarding the obligation to pay a commission. However, it sheds no light on the meaning of "purchase," leaving the reader in the end precisely where the inquiry began. More to the point, it manifests no indication of an intent as to the consequences of failure to consummate an executory contract to purchase.

[5]This subdivision is as follows: "A term of a contract is that portion of the legal relations resulting from the promise or set of promises which relates to a particular matter, whether or not the parties manifest an intention to create those relations." Comment b to section 5 elaborates the distinction between the provisions of a contract and its terms: "*Contract terms supplied by law*. Much contract law consists of rules which may be varied by agreement of the parties. Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of an agreement. They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties . . . ."

concerning the payment of a commission are applied unless the parties specify a contrary rule.

"In this state it is well established, in the absence of any specific agreement to the contrary, that a broker employed to sell real or personal property has earned his commission when, within the life of his contract, or any extension thereof, he has produced a person who is ready, willing, and able to purchase the property on terms satisfactory to the seller, and has obtained a binding and valid contract for a sale on the terms proposed by the seller, or has brought the seller and buyer together and thus enabled them to enter into a contract of sale, or has produced such a purchaser who has verbally accepted the seller's terms and offered to enter into a written contract embodying the said terms and binding upon both parties. In such cases the broker's right to commission accrues when the contract of sale is executed, or when opportunity to make such contract is given the seller, and the broker becomes entitled to his commission even though the seller is unable or unwilling to complete the sale. [Citations.] . . . The broker has performed his duty and has earned his commission regardless of . . . whether the sale is ever consummated by the delivery of the property and the payment of the purchase price." (*Twogood* v. *Monnette* (1923) 191 Cal. 103, 107 [215 P. 542].)[6]

Where the executory contract of sale is conditional, e.g., the obligation of performance is conditioned upon obtaining third party financing, the commission is not earned if the condition is not satisfied. (See, e.g., *Kopf* v. *Milam* (1963) 60 Cal.2d 600, 605 [35 Cal.Rptr. 614, 387 P.2d 390].) A condition which makes the commission turn on the satisfaction of a party to the purchase/sale contract does not render the contract illusory or permit that party to withdraw from the contract at his pleasure. (See *Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 881-883 [306 P.2d 783].)

■ In the absence of a principled reason for distinction we will apply these rules to a brokerage contract by which the principal employs a broker to find and negotiate a purchase of real estate. Hence, unless the contract provides otherwise, the broker earns his commission upon the principal's entry into a binding contract for a purchase subject to the brokerage contract regardless whether the sale is consummated. (See, *Allen* v. *Gindling* (1955) 136 Cal.App.2d 21, 28 [288 P.2d 130]; cf., e.g., *Donnellan* v. *Rocks* (1972) 22 Cal.App.3d 925, 930-931 [99 Cal.Rptr. 692].)

---

[6]*Leonard, supra,* 51 Cal.2d at page 652, citing *Twogood,* restates this as follows. "Where a landowner has agreed to pay a real estate broker a commission in the event of a sale, 'a sale' means the making of an executory binding agreement by which the property is to be sold to a purchaser obtained by the broker." (See also, *Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 572-573 [102 Cal.Rptr. 170].)

As related, the parties are at liberty to vary this rule and to condition the obligation to pay a fee upon the consummation of the purchase transaction. Here both sides accept the view that the brokerage contract in this case makes the consummation of the purchase a condition of the obligation to pay the commission. Accordingly, we accept that construction without examination. (See Civ. Code, §§ 1644, 1649, 1654.)

■ Nonetheless, where such a condition is stipulated it is subject to the constraint that the "law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase." (*Coulter* v. *Howard* (1927) 203 Cal. 17, 23 [262 P. 751]; also see, e.g., *Collins* v. *Vickter Manor, Inc., supra,* 47 Cal.2d at p. 881; *Stromer* v. *Browning* (1966) 65 Cal.2d 421, 424-425 [55 Cal.Rptr. 18, 420 P.2d 730].) This rule appears to be grounded on the implied covenant of good faith and fair dealing. (See, e.g., *Dunne* v. *Colomb* (1923) 192 Cal. 740, 745-747 [221 P. 912]; *Colwell Co.* v. *Hubert* (1967) 248 Cal.App.2d 567, 575-576 [56 Cal.Rptr. 753].) "Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." (Rest.2d Contracts, § 225, subd. (1).) The nonoccurrence of a condition may be excused by "prevention or hinderance of its occurrence through a breach of the duty of good faith and fair dealing." (*Id.* com. b.; also see Civ. Code, §§ 1498, 1512.) Again, in the application of these rules we see no basis to distinguish the principal who is a buyer from the principal who is a seller.

■ Moreover, there is a specific implication in the written contract that Sullivan was obliged to complete any purchase transaction once he contracted to purchase. The "cooperation" clause promise that "[a]fter execution of an accepted purchase . . . agreement, [Sullivan] in a timely manner shall deposit in escrow or otherwise furnish all documents necessary to complete the transaction" impels the view that Sullivan was not at liberty to abort a purchase transaction at will.

For all of these reasons we conclude that Sullivan's obligation to pay a commission if the transaction were not consummated at his behest is subject to the covenant of good faith and fair dealing.

That, however, does not provide a simple guide to a solution of the problem at hand. (See, *Stromer, supra,* 65 Cal.2d at pp. 427-428.) "[D]efining what is required by this covenant has not always proven an easy task." (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710].) ■ The

term "good faith" is applicable to a wide spectrum of conduct affecting obligations undertaken pursuant to contracts and its meaning is necessarily dependent on the context.

"The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." (Rest.2d Contracts, § 205, com. a.)

The opinion in *Carma* observes: "Instead of defining what is consistent with good faith and fair dealing, it is more meaningful to concentrate on what is prohibited." (*Carma, supra,* 2 Cal.4th at p. 372.) However, "bad faith" also has broad connotations.

"Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." (Rest.2d Contracts, § 205, com. d.)

■ The record affords no extrinsic evidence on community standards, norms, or customs regarding fair dealing in similar transactions and we are left with our own sensibilities and the normative judgments embedded in the case law. The rule that the principal may not prevent the consummation of the purchase contract would have little meaning if the principal could avoid liability for the commission because he had reevaluated the wisdom or attractiveness of the purchase. The brokerage which expends time and effort on behalf of the buyer has a justifiable expectation that the buyer is sincere and serious and that if a purchase contract is made, the buyer will not abandon it in order to obtain an economic advantage unfairly derived from the broker's services. "One must not change his purpose to the injury of another." (Civ. Code, § 3512.)

If a buyer under an executory contract for the sale of real property sold his right to receive title to another for money exceeding the amount of the

commission, and then refused to pay the broker's commission, we would not hesitate to call this bad faith. (See generally, *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865].) Otherwise the buyer would effectively pocket part or all of the broker's commission, unjustly taking advantage of the broker's services without compensation.

The market value of property is the price which a willing buyer would pay for it in the marketplace. But, as the course of negotiations between Sullivan and Sacramento Savings, in which the selling price was discounted by subtracting the broker's fee payable by Sullivan shows, that "price" includes the aggregate cost of the purchase to the buyer. Where a broker must be paid from funds in addition to those to be paid to the seller the true price of the property is the aggregate amount. If a substituted purchaser can obtain the property for the contract price and evade the broker's commission he obtains it, in effect, below market. If the original purchaser receives pecuniary benefits for surrendering his place in the transaction, they are funded from the broker's expected commission. This consideration accounts for the trial court's critical reliance on the insight that Sullivan "obtained an immediate economic advantage" from the transfer of his position to Khachaturian. (Cf. *Buckaloo, supra,* 14 Cal.3d at p. 827, holding a broker's cause of action for interference with prospective economic advantage against an interloper depends upon receipt of "pecuniary benefit in the way of a reduced selling price resulting from the exclusion of the broker's commission.")

Sullivan traded his position under the contract with Sacramento Savings for a valuable consideration, an option to purchase one-half of the property and indemnification for one-half of any commission he might owe Kuhl. The economic value of this consideration was not trivial. The possibility that Kuhl would press its claim for a commission was significant as was the objective possibility that Kuhl might prevail; even without the benefit of hindsight potential litigation costs and liability presented Sullivan with a substantial exposure. The value of the option was also significant; Sullivan projected his control over the property into the future, initially at no cost. Both the gain subsequently realized on the sale by Khachaturian of the property on which Sullivan had the option, and the exchange of the remaining half of indemnity coverage (after this litigation had already commenced) for surrender of the option show the substantial value of the option Sullivan obtained.

Both Sullivan and Khachaturian suggest that a full commission to Kuhl cannot be predicated on these considerations because under the brokerage contract Sullivan was only obligated to pay Kuhl a fee of $1,000 for

obtaining an option unless he exercised it within its term. The argument has only superficial appeal, as it disregards the actual history of the transaction. If, as a result of Kuhl's services to Sullivan, Sacramento Savings had granted Sullivan an option on the half of the property in which he was interested, the provision for a fee pertaining to an option would apply. However, Sacramento Savings showed no such inclination.

Sullivan obtained his valuable option right and his valuable indemnity right only by "selling" his contract right to purchase the entire property, obtained as a result of Kuhl's services, to Khachaturian. This conversion of the right to purchase the entire property into an indemnity and an option let Sullivan profit unfairly from Kuhl's services. The service that Kuhl provided to Sullivan facilitated his acquisition of the contract right to obtain the entire property. Sullivan could not have defeated Kuhl's right to a full commission claim if he had consummated the purchase and then sold the property to Khachaturian for the purchase price plus the option and indemnity. This is effectively what happened in this case.

Sullivan's failure to complete the purchase contract with Sacramento Savings was not excused. The failure to do so or, in lieu thereof, to pay the commission measured by the Sullivan/Sacramento Savings contract price breaches the implied covenant of good faith and fair dealing. That, notwithstanding the lack of candor in dealing with Kuhl, Sullivan honestly may have believed he was entitled to avoid the Kuhl commission in this fashion is immaterial. "Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Carma, supra,* 2 Cal.4th at p. 373.)

For all of the foregoing reasons, we hold that consumation of the purchase of the property by Sullivan as a condition to payment of the fee was excused by a breach of the duty of good faith and fair dealing. Accordingly, the trial court did not err in finding that Sullivan breached the brokerage contract by failing to pay Kuhl the commission.

## II-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

In view of the foregoing none of the other points raised in the briefs warrant discussion. Kuhl shall recover its costs and reasonable attorney fees,

---

*See footnote 1, *ante,* page 1593.

which shall be determined by the trial court, for this appeal. The judgments and orders awarding attorney fees are affirmed.

Davis, J., and Raye, J., concurred.

Petitions for a rehearing were denied March 31, 1993, and appellants' petitions for review by the Supreme Court were denied May 27, 1993.