[L. A. No. 11544.   In Bank.—June 23, 1932.]

J. D. THOMAS, Respondent, v. JESSIE E. LAVERY, Appellant.

Paul Friedman for Appellant.

Charles E. Hobart for Respondent.

SEAWELL, J.—Defendant Jessie E. Lavery appeals from a judgment awarding plaintiff J. D. Thomas damages in the sum of $30,856 for breach of a contract executed on November 12, 1925, whereby he was given the exclusive right to sell fifty-seven lots in a subdivided tract in the city of Los Angeles owned by said Jessie E. Lavery. Plaintiff sued to recover for loss of future profits or commission which he alleged he would have earned from the sale of lots unsold on August 1, 1927, had he not been wrongfully prevented from selling said lots. Emma L. Barnett, a daughter of Mrs. Lavery to whom she conveyed the property by deed after entering into a contract with plaintiff, and W. C. Barnett, husband of Emma L. Barnett, were named as parties defendant. A judgment of nonsuit was entered in their favor from which no appeal has been taken.

Mrs. Lavery filed an answer wherein she denied that plaintiff had performed the terms and conditions of said

contract, and also denied that he had been damaged in any sum whatever. We are of the view that the evidence fails to sustain plaintiff's right to damages in the sum allowed, and on that ground must reverse the judgment. Plaintiff is entitled to the decision on the other points raised. For the reason that an understanding of said issues is necessary to a consideration of the plaintiff's right to damages, we will discuss them first.

The contract involved was executed on November 12, 1925, by plaintiff and W. C. Barnett, as agent and trustee for Mrs. Lavery. Following the main agreement is Mrs. Lavery's authorization to Barnett to execute the sales-agency contract, signed by her at the same time the main contract was executed. Mrs. Lavery was then eighty-five years of age. Thomas had dealt with Barnett in the preliminary negotiations, and it was contemplated that future transactions should be conducted with him. The agreement provided that Thomas should sell said lots at prices ranging between $560 and $885, as set forth in a schedule annexed to the agreement, and that all sums over and above said prices for which lots should be sold were to be retained by him "as his commission or compensation for selling said lots". Mrs. Lavery was to receive a down payment of $25, and to enter into a contract of sale with the purchaser by which the balance, with interest thereon, was to be paid in monthly installments agreed on between Thomas and the purchaser. The monthly payments of principal were to be divided equally between Thomas and Mrs. Lavery, and interest payments apportioned according to the amount due each. That is, the monthly payments of principal were to be divided equally until either Mrs. Lavery had received the scheduled price to her in full, or Thomas had received the full amount of his commission, and thereafter whichever of the two was not paid in full would be entitled to the entire amount of monthly payments.

By the original contract Thomas agreed to sell three lots each month commencing with January, 1926. On January 8, 1926, Barnett signed the following memorandum at the request of Thomas: "With addition to a certain contract for the sale of fifty-seven lots Tract 8304 dated November 12, 1925, it is understood and agreed that the term of 3 lots per month to be sold is meant an average of 3 lots per

month to be sold or 36 lots per year, or any amount of lots sold over and above the required quota is to apply on the next preceding month's quota.''

Difficulties and disagreements soon arose between Barnett and · Thomas. A controversy as to whether Thomas was entitled to his full commission on sales where the purchasers defaulted and forfeited their contracts, was resolved with the understanding that Thomas should resell such lots, and, as testified by Thomas and found by the court, that resales should be counted in computing the term of the contract. Resales made during 1926 and 1927 were accepted by Barnett and after June 1, 1927, by Mrs. Lavery personally. Additional down payments of $25 were not made to Barnett or Mrs. Lavery upon resales, but the amount of the down payment and the total of monthly payments received on the prior contract were deducted from the list price to her, and the balance, with interest from the date of the last payment, represented the amount due the seller under the resale contract.

By the written addition of January 8, 1926, to the contract, Barnett, on behalf of Mrs. Lavery, waived strict compliance with the requirement of three sales each month on condition that Thomas sell at the rate of thirty-six lots a year, or an average of three a month. Said waiver, which was accepted and acted upon by Thomas, bound Mrs. Lavery on principles of estoppel. No attempt was ever made by her to withdraw said waiver. The contract contained no express provision authorizing Thomas to make resales. It gave him the option to pay the balance due on defaulted contracts himself, but it is silent as to whether the right to sell all lots in the tract was to include the right to sell lots upon which contracts had been forfeited. The court below found in favor of Thomas that it was the understanding between him and Barnett that he should make resales and count them in estimating the time for completion of the contract. The contract had no fixed date of expiration. Under the written waiver of January 8, 1926, lots were required to be sold at the rate of thirty-six a year, which meant that if resales were not to be counted the fifty-seven lots were required to be sold by August 1, 1927. If, as we must hold, in view of the findings of the trial court, resales were to be counted, each lot upon which a contract was

forfeited increased the number to be sold, and the term of the contract was extended one month beyond August 1, 1927, for every three such lots. The number of forfeitures shown was sufficient to extend the contract several months beyond August 1, 1927.

■ This construction placed upon the contract by the parties was binding, although not reduced to writing. It was not a true alteration, but an interpretation placed on a contract of doubtful import and confirmed by subsequent dealings. (*Kales* v. *Houghton*, 190 Cal. 294 [212 Pac. 21]; *Smith* v. *Blodget*, 187 Cal. 235 [201 Pac. 584]; *Yule* v. *Miller*, 80 Cal. App. 609 [252 Pac. 733]; *Katz* v. *Bedford*, 77 Cal. 319 [1 L. R. A. 826, 19 Pac. 523].)

■ We pass now to consider the facts upon which plaintiff relies to prove a prevention of performance and wrongful termination of the contract. A deed dated May 26, 1926, from Mrs. Lavery to her daughter Emma L. Barnett, was recorded in March or April, 1927. Between November 10, 1926, and February 10, 1927, in transactions involving three purchasers, Barnett had delivered to Thomas a deed and five contracts signed by Mrs. Barnett as seller and owner, rather than by Mrs. Lavery. Thomas accepted said contracts, but requested Barnett to procure a written authorization from Mrs. Lavery for contracts to be executed by Mrs. Barnett and payments made to her. Barnett gave as an excuse for his failure to procure this statement that Mrs. Lavery was ill and unable to go to an attorney's office to have it prepared. In March, 1927, Mrs. Barnett refused to sign an agency agreement similar in form to the original agreement except that it contained more specific resale provisions. This is the first indication given Thomas, so far as the record shows, that the Barnetts would not recognize the understanding previously had between Barnett, as agent for Mrs. Lavery, and Thomas that resales should be counted in computing the term of the contract.

On June 17, 1927, in confirmation of previous oral notice, Mrs. Lavery gave Thomas written notice revoking Barnett's authority to represent her. On June 3, 1927, she had filed an action against Mr. and Mrs. Barnett for cancellation of the deed to Mrs. Barnett and for an accounting, alleging that Barnett, her trusted agent, had secured her signature to the deed at the same time she signed a number of other

papers by concealing from her that it was a deed. She further alleged that she first learned it was a deed on May 20, 1927; and that her said daughter claimed to be the owner in fee, denied that her mother had any interest in the property and refused to account for moneys received on contracts.

Between June 11 and August 1, 1927, Thomas procured purchasers for eleven lots, and Mrs. Lavery signed contracts of sale with said purchasers. During this period Thomas called upon the Barnetts, who claimed title and the right to execute contracts to be in Mrs. Barnett, at least twice, in an effort to reach some understanding, but was unsuccessful. Mrs. Lavery's attorney informed him in July, 1927, that the suit between Mrs. Lavery and her daughter was to be dismissed, and that Mrs. Lavery was not to sign any more contracts. On July 27, 1927, Thomas presented contracts for the sale of three lots, accompanied by a check for $75 as a down payment, to the Barnetts, but Mrs. Barnett refused to execute said contracts. On August 6th, one Fleming, at the request of Mrs. Barnett, wrote to Thomas as follows: ''Mrs. Emma Barnett, of Santa Monica, has directed me to notify you that the sales agreement entered into by and between you and Jessie E. Lavery on November 12, 1925, for the sale by you of the then unsold lots in Tract 8304, City and County of Los Angeles, has expired and terminated by its own limitations, and in so far as said agreement concerns Mrs. Barnett and the present unsold lots in said tract 8304 is null and void and at an end.''

The merits of the suit for cancellation between Mrs. Lavery and Mrs. Barnett, which was dismissed before trial in October, 1927, were not developed in the action herein. The evidence shows that the Barnetts consistently maintained that Mrs. Barnett was the owner in fee under the deed of May 26, 1926, and that Mrs. Lavery had no right, title or interest therein, and they so alleged in their answer filed in the action brought by Mrs. Lavery. Although denying Mrs. Lavery's allegations in her complaint, the Barnetts in their said answer offered no affirmative explanation of the transaction, nor did they allege that any consideration was given for the deed. Futhermore, it would not follow that because Mrs. Lavery intended to transfer title to the property, that she also intended to assign the right to execute

contracts and receive payments thereunder. There is absolutely no showing of an assignment of payments due under contracts executed or to be executed, yet subsequent to May 26, 1926, all payments were deposited by Barnett in the joint account of himself and wife.

Whether Mrs. Barnett held the record title lawfully or as the result of fraud practiced by her husband, Thomas could not perfect title in purchasers procured by him without her consent, and she had unequivocally and repeatedly asserted both to Thomas and to her mother's attorney, in the course of correspondence preceding settlement of the cancellation suit, that she would refuse to execute or recognize contracts procured after August 1, 1927. That Mrs. Barnett took with notice of plaintiff's rights there can be not the slightest doubt. Mrs. Lavery's conveyance would not have prevented performance had Mrs. Barnett recognized Thomas' rights. But in the circumstances before us, Mrs. Lavery had disabled herself from transferring title to purchasers and performing her contract with plaintiff when, according to the allegations of her answer herein, she refused to sign any more contracts because of the dispute and litigation as to ownership. A real estate agent in the circumstances shown is absolved from continuing his efforts to sell when ownership is in litigation, and it appears certain that he will not be able to complete title in purchasers secured by him without legal action. (See *Alderson* v. *Houston,* 154 Cal. 1 [96 Pac. 884].) We do not here find it necessary to pass on the liability of the Barnetts for damages to plaintiff, as no appeal has been taken from the nonsuit in their favor.

■ The court below awarded plaintiff damages in the sum of $30,856. By reason of the provision that he was entitled to retain as "compensation or commission" all sums for which lots should be sold over and above the prices to Mrs. Lavery as listed in the contract, he contends that his damages are the difference between the list prices of the lots unsold on August 1, 1927, and the market value of said lots. There were nineteen lots upon which there were no contracts outstanding on August 1, 1927. The list of twenty-four lots given by plaintiff erroneously includes four of the lots for which Mrs. Lavery signed contracts, although there is no evidence that said contracts had been

canceled, and also lot 52, which had been deeded to a purchaser. The contracts signed by Mrs. Lavery were not void. Had all of said nineteen lots been sold the seller would have realized but $14,375. By the judgment of the court, plaintiff recovers $30,856, more than twice this amount as commission, an unconscionable sum in the circumstances of the case.

There is absolutely no showing of any great increase in values to account for the great discrepancy between the amount Mrs. Lavery was to receive for lots in the tract, and the values of said lots upon which the testimony of plaintiff and the judgment of the court were based. No claim is made that plaintiff was to render any services except as a real estate broker. The lots had frontages of 25, 40, 45, 50 and 54 feet. Upon an examination of the record, however, it becomes apparent that the testimony given by plaintiff and his witnesses as to the price for which lots could be sold was expressly based upon their value completely improved with facilities for water, gas, lights and curbs and sidewalks, while the values upon which the contract was based excluded said improvements. It was provided by the contract that Mrs. Lavery should install improvements when $14,000 had been paid to her. This provision is reiterated in a statement addressed to Thomas and signed by Mrs. Lavery and Barnett on March 1, 1926, when Thomas himself purchased two lots. Nevertheless, early in 1926 Thomas stated that purchasers to whom he had sold for building purposes were defaulting because provision was not then being made for an immediate water supply, and that if their contracts were forfeited he intended to hold Mrs. Lavery personally liable for his full commission. The conclusion is inescapable that Thomas had made sales to purchasers without disclosing to them that improvements were not to be made until the owner had realized $14,000 from the tract. The proportion of contracts forfeited for nonpayment was very large. Of the nineteen lots upon which there were no outstanding contracts on August 1, 1927, seven were lots upon which contracts had been forfeited. With a down payment of only $25 and the balance in small monthly installments, Mrs. Lavery would not receive $14,000 for a number of years. There was absolutely no showing that the number who desired to pay immediately

for their lots and to build was so large as to assure payment of $14,000 in the near future.

It is true that on November 29, 1926, Barnett, as agent for Mrs. Lavery, agreed that if the purchasers of lots 53 and 22 paid their unpaid balances in full the money would be used for improvements, but the amount thus received would fall far short of the sum required to improve the entire tract. Furthermore, it does not appear that the purchasers of both of said lots paid in full. Plaintiff himself testified that Barnett accepted a deed of trust for the balance due on one of the lots. Plaintiff's testimony as to Barnett's statement that moneys received from purchasers who had bought lots before the plaintiff's contract would be used for improvements, falls far short of establishing an unconditional obligation, contrary to the express terms of the contract, to install improvements throughout the tract immediately.

Plaintiff failed completely to show a reasonable probability that these nineteen lots in an unimproved tract, for which the owner was to receive $14,375, could be sold for prices sufficient to net him the commission of $30,856 allowed by the court. Under the terms of the contract his commissions were payable only from payments made by purchasers. (*Lind* v. *Huene*, 205 Cal. 569 [271 Pac. 1087]; *Dunne* v. *Colomb*, 192 Cal. 740 [221 Pac. 921].; *Margolis* v. *Los Angeles First Nat. Trust & Sav. Bank*, 122 Cal. App. 186 [9 Pac. (2d) 526].) The seller assumed no general liability therefor. ■ The fact that a large number who had purchased at prices fixed by Thomas had defaulted and forfeited their contracts, and that in some cases there had been a default upon resales, demonstrates the utter improbability of plaintiff ever receiving commissions on said nineteen unsold lots in any sum approaching the judgment of the court. (See *Alderson* v. *Houston*, 154 Cal. 1 [96 Pac. 884].) Plaintiff testified that he had made fifty-six sales, yet on August 1, 1927, there were no outstanding contracts on nineteen of the fifty-seven lots in the tract.

There is a further circumstance we wish to note. In all cases where the details of sales appear, either from copies of deposit receipts and contracts given purchasers or otherwise, the purchasers made down payments of between $50 and $412, yet in no case was the seller allowed more than

$25 of the down payment, and in case of resales she received no part of the down payment. Under no fair construction of the contract was plaintiff entitled to the entire amount of the down payment over $25, but he was under obligation to divide it with the seller. The result is that plaintiff has already received in cash sums which in many cases far exceed a reasonable commission on the list price. In cases where resales are involved it is fairly inferable that plaintiff has collected a cash payment twice. On the resale of lot 26, listed at $885, plaintiff received and retained $412 as a down payment. The contract of resale has been forfeited.

It appears that copies of the deposit receipts were given Mrs. Lavery from which it appeared that plaintiff was retaining the amount of the down payment over $25, or the entire amount in cases of resale, and there is no evidence that she raised any objection thereto. However, Mrs. Lavery was over eighty-five years of age. The contract had been negotiated by Barnett, and until the controversy as to ownership he seems to have had entire management without supervision or control from Mrs. Lavery. Although she consulted an attorney upon the development of said controversy, she nevertheless appeals as an aged woman confused and bewildered as to the course she should have pursued. This confusion persisted through the trial of the action herein, and accounts for Mrs. Lavery's failure to put on a defense. Her daughter and son-in-law, who occupied a position adverse to her during at least a portion of the period covered by the transaction, and who by their wrongful refusal to recognize plaintiff's rights have placed her in a position of liability to him, appear to have been exclusively concerned in defeating their own liability, and thus to have left her without the aid and counsel which a woman of advanced years may normally expect from her children. We have given thorough and careful consideration to the record, and are of the view that the case must be reversed on the weakness of plaintiff's showing of damages.

Judgment reversed.

Langdon, J., Curtis, J., Tyler, J., *pro tem.*, Preston, J., and Waste, C. J., concurred.

Rehearing denied.