[Civ. No. 25135. First Dist., Div. One. Sept. 29, 1969.]

OTTO E. NEVER, Plaintiff and Appellant, v. BEN R. KING
et al., Defendants and Respondents

Severson, Werson, Berke & Bull, Kurt W. Melchior and David A. Self for Plaintiff and Appellant.

Owen, Melbye & Rohlff and Cyril Viadro for Defendants and Respondents.

SIMS, Acting P.J.—Plaintiff, licensed under the laws of this state and engaged in business as a real estate and mortgage loan broker, has appealed from a judgment entered on a directed verdict which denied him any compensation or damages from defendants who had given him the exclusive right to negotiate for a loan on their behalf in order to finance the construction of a medical-dental building. The record fails to show that any loan or other method of financing was consummated during the term of the agency agreement, or, for that matter thereafter.[1] The controversy revolves about the broker's contentions that he substantially performed his undertaking by making arrangements, which were thwarted by defendants' repudiation, for funds sufficient to carry out the project contemplated by defendants, and that, in any event, he is entitled to the commission set forth in the agreement because the defendants expressly and unequivocally repudiated and revoked their contract with him before it expired.

At the conclusion of the trial each side moved for a directed verdict. The broker now contends that it was error to deny his motion, and that he is entitled to judgment as a matter of law. In the alternative, he claims a right to a new trial because the court erred in directing a verdict for his adversaries. The latter claim is first reviewed. Since it appears that the court correctly directed a verdict for the defendants because of a lack of substantial evidence to sustain plaintiff's

---

[1] Defendants' representative testified that he and his associates never got a loan in the amount specified in the contract from plaintiff or from any other source, and that negotiations for a lease and buy-back, which were admittedly initiated with others during the terms of plaintiff's contract, proved fruitless. Plaintiff's objection to this testimony was sustained, but it was not ordered stricken. Although defendants' representative advised plaintiff, ''I have sought and obtained financing elsewhere,'' the only evidence in the record concerning other arrangements is a 30-day authorization to sell the property subject to a lease-back of improvements to be erected on the premises with an option to the lessees to buy back the land and improvements.

claim, there was, a fortiori, no error in denying plaintiff's motion.

 Review in this case is governed by oft-enunciated principles recently set forth in *Taylor* v. *Centennial Bowl, Inc.* (1966) 65 Cal.2d 114 [52 Cal.Rptr. 561, 416 P.2d 723], as follows: "Such a verdict may be properly granted if and only if, after disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in plaintiff's favor, it can be said that there is no evidence of sufficient substantiality to support a jury verdict in her favor. [Citations.]" (65 Cal.2d at pp. 120-121.) The evidence as set forth below must be evaluated accordingly.

*Statement of Facts*

In February or March 1964, plaintiff contacted defendant Dr. Ben R. King, representing those defendants doing business as "Truckee-Tahoe Medical Group," in reference to financing desired by the doctors for a proposed medical-dental building and other improvements to be erected upon property owned by the defendants. Pursuant to the conversation, a meeting was arranged to discuss plans for construction, and financing needs. Plaintiff had been referred to Dr. King by Lloyd Johnson, an insurance agent who specialized in writing life insurance for people in the medical profession. Johnson often provided unsecured loans for doctors in order to sell large life insurance policies.[2]

In March 1964 the parties met for the first time. Dr. King and defendant Dr. Brodie attended the meeting. Although the doctors were vague as to what construction would cost, they definitely indicated "that had to have a hundred percent loan, and they did not have any liquid cash." Plaintiff explained that he could probably get an unsecured loan to pay for the lot, "and we'd have to get an estimate of the cost of the building." In July 1964 plaintiff met with Dr. King at Truckee. Plaintiff brought with him an unlicensed builder named Combs, with whom plaintiff had dealt. Combs gave the doctor an oral estimate of construction costs of $116,000. All other bids submitted were higher. Combs' bid was not acceptable to defendants' architect.

---

[2] Plaintiff described Johnson's business as follows: "Well, in his business of writing life insurance, he would arrange unsecured loans for doctors, and he had a revolving fund or special fund—whatever you might call it—and as a rule, doctors were unable to pay a large policy, or they might have a problem of income tax, so he would bring them a policy of insurance and advance them the money through the Crocker-Citizens Bank, through this fund, in many ways in order to assist in selling them large life insurance policies of 50 to two, $300,000."

On February 18, 1965, plaintiff submitted a loan offer to Dr. King of $110,000. This offer was rejected by the doctor. Some time in March 1965, plaintiff testified he told Dr. King, "Now, I feel that it is time to sign an agreement so I can represent you and get the loan that we have talked about. . . . I will try and get you a hundred and fifty thousand, *but I can't because that is unreasonable*, but I have got enough for you now so that you can go ahead and build your building and pay the lot." (Italics added.)

Plaintiff felt he had enough money for the doctors because he thought he could get a secured loan of $130,000 and an unsecured loan, from Johnson, for $39,000. Since plaintiff estimated that building costs would be $116,000 to $120,000, he felt this amount left the doctors with $10,000 over their needs. Plaintiff conceded at trial that when the $39,000 loan was discussed, it was not considered within the terms of the proposed agreement for $150,000.[3]

On March 20, 1965, Dr. King signed the following loan brokerage contract with plaintiff on behalf of the group: "The undersigned hereby applies to OTTO E. NEVER, for financing in the amount of One Hundred Fifty Thousand and no/100 Dollars ($150,000.00), or such amount as may be later mutually agreed upon, for a term of 15 years, with interest at the rate of 6¾% per annum, payable monthly, to be secured by a Deed of Trust on the following described property . . . [description omitted] . . . The undersigned agrees to pay OTTO E. NEVER, a loan fee of 5% of the loan amount agreed upon, for negotiating said loan and preparing and filing of papers, and hereby authorizes the title company to deduct said loan fee from the proceeds of the loan. It is further agreed that if OTTO E. NEVER is unable to complete said financing through failure of the undersigned to properly execute the necessary papers, that the undersigned will pay

---

[3]The testimony in this regard was as follows: "Q. Did you tell him whether or not that $39,000 would be within the terms of this agreement, in other words, part of that agreement? A. No, the $39,000 would be in addition to the secured loan, that I would get him an unsecured loan to pay for the lot; then, the lot would appear clear; there would be no liens on it, and we could then place the insurance company loan on the lot. . . . Q. Okay. Then, one thing I want to make clear: We agree that this $39,000 to pay off the obligation on the land was separate from your agreement with Mr. King concerning the procurement of a secured loan; is that not so? A. I don't know how you mean this. It was all a package. Q. Well, I am using your words. To use your words, '$39,000 was in addition to the secured loan reflected in this agreement.' A. Oh, yes, I agree. Q. All right. So, we are not talking about that; that is not in dispute in this lawsuit. We agree on that, Mr. Never? A. Yes."

said OTTO E. NEVER, on demand, the above fee and all expenses incurred by him as above provided.

"OTTO E. NEVER is hereby authorized the exclusive right to negotiate the above-mentioned loan until May 30, 1965. . . ."

Dr. King testified that between March 20th and the end of April 1965, he spoke with plaintiff twice. The first conversation occurred about two weeks after the agreement was signed. Plaintiff called Dr. King with a loan proposition of $110,000. Dr. King testified he told plaintiff he could not accept that amount "that that was not enough money; it wouldn't do me any good; that I had to have a hundred and fifty thousand dollars. He told me he could not get me a hundred fifty thousand dollars and I shouldn't expect it, and I told him that I had to have it." Subsequently, Dr. King called plaintiff and asked about the possibility of plaintiff's working out a lease and buy-back arrangement. Dr. King told plaintiff that he was then looking into the possibility of financing through a group in Sacramento.[4]

On May 11, 1965, King and defendants Pier and Brodie signed a brokerage agreement with Hicok & Company. Hicok was to have 30 days within which to sell and arrange for the lease and buy-back of defendants' property for a 6 percent commission. Dr. King testified that it was "understood that I still had—that Mr. Never still was attempting to get the hundred fifty thousand dollar(s), though virtually, he felt that it was impossible for him to get it. I thought it was impossible for him to get it because he said so."

Dr. King testified further that on May 14, 1965, plaintiff phoned him and told him he had a $130,000 loan from an insurance company for him. Dr. King told him that $130,000 was not enough "that I had to have a hundred and fifty thousand dollars, and that since it was obvious I wasn't going to get the hundred and fifty thousand dollars, I decided to attempt to establish this lease and buy-back arrangement of

---

[4]It is undisputed that defendant King applied for a loan at the Bank of California in Auburn in the middle part of April. Mr. Hayden, representing the bank, referred the doctor to a Mr. Hewitt of Hicok & Company, as well as to three or four other lending agencies. Defendant King contacted and met Mr. Hewitt later in April, and they discussed the possibility of securing financing for the proposed construction. Mr. Hewitt arranged a meeting with an insurance company. After an appraisal by this company they indicated that they could give the doctor "a figure considerably lower than $150,000." The doctor then discussed "The possibility of a lease and buy-back arrangement for financing with Mr. Hewitt."

financing because I couldn't get along with less than a hundred fifty thousand dollars.''

Plaintiff testified that the first time he called Dr. King after the agreement was signed was on May 14th. Plaintiff related the conversation as follows: "I told him that I had this application [for $130,000 for 17 years at 6 1-2 percent] and that I would ask him to sign it and to pay approximately one point earnest money to the insurance company to assure them that when the commitment was given for the loan that he would take the loan, which is customary. He said . . . 'I don't want to go ahead with it.' I explained to him then that I had worked on this loan for almost a year and a half and the companies that I had contacted, the expenses I have been to, and I said, 'Doctor, I have your loan; I can build your building for you and pay for your lot. What more do you want?' He said 'Well, I have a company that's been to me from Sacramento that will make me a leased-backed building'; that is able to lease a building and he won't have so much expense and trouble as if I would if I build my own building. I said, 'Doctor, you entered into an agreement with me and I lived up to it.' He said, 'Well, I am not going to go ahead with it.' "

Plaintiff stated there was no conversation in which Dr. King said he had to have $150,000 and could not get along with less. Rather, he felt the conversation was that Dr. King "had to build a building and he wanted sufficient funds to build the building and I showed him what the cost would be, and the hundred and thirty thousand dollars was ample for the building." Plaintiff indicated he knew that bids had come in on the building for in excess of $150,000, but that actual figures worked out with Combs indicated the building would cost about $30,000 less.

After the conversation on May 14th, King addressed the following letter to plaintiff: "In view of the great delay in obtaining finances through your service, and your indication in our recent telephone conversation that you would not be able to obtain the financing that we require, and that we at first agreed upon, I have sought and obtained financing elsewhere. We are now arranging a lease and buy-back contract with a building contractor who is in a position to finance as well as build the building we want, and feel that his is the best and probably the only avenue we have of obtaining the construction we need in the near future.

"I very much appreciate your efforts in our behalf and am sorry that you are unable to adequately meet our needs.''

Plaintiff never refuted the letter. He never submitted an offer to Dr. King of $150,000 on a secured loan. Plaintiff testified that he "could" have told Dr. King on May 11th or before that he could not get a loan for $150,000. Dr. King testified that he never· stated he would accept less than $150,000 on the secured loan. He admitted on cross-examination that plaintiff never told him he was going to stop looking for the $150,000 loan. He further testified, however, that plaintiff told him if he did not accept the $150,000 loan he would sue for his commission.

*Substantial Performance*

In his complaint the broker set forth the agreement of March 20, 1965 under which the owner applied "for financing in the amount of . . . $150,000.00 . . . or such amount as may be later mutually agreed upon, . . ." He alleged breach and termination of the agreement on May 14, 1965, and that had he "been permitted to complete performance under said agreement, the loan amount supplied to defendants under said agreement would have been . . .. $177,000.00, . . ." He sought a 5 percent commission on that amount, or $8,850. In his pretrial statement these sums were modified to $169,000 and $8,450, respectively. The pretrial order generally incorporates this demand, and notes that defendants deny any breach of contract and claim that plaintiff failed to perform.

The foregoing allegations and contentions are predicated upon the right of a broker to recover when he produces a lender ready, able, and willing to make a loan upon the terms proposed. (See *McCoy* v. *Zahn Corp.* (1920) 183 Cal. 191, 195 [191 P. 20] ; and *Keystone Mortgage Co.* v. *MacDonald* (1967) 254 Cal.App.2d 808, 812 [62 Cal.Rptr. 562] ; and cf. *Martin* v. *Culver Enterprises, Inc.* (1966) 239 Cal.App.2d 925, 930-931 [49 Cal.Rptr. 149].)

It was established that the $39,000 unsecured loan, which plaintiff suggested he used to cover the cost of the property, was not a part of the subject matter of the negotiations and contract. (See fn. 3, above.) Plaintiff suggests that $169,000 is more than the $150,000 for which defendants' bargained, and that the question of security is one which only concerns the creditor. There is a difference, however, between owning a completed building which is subject to a $150,000 mortgage or deed of trust, and having no other personal obligations, and owning a completed building which is subject to a $130,000 lien and also being further personally obligated for $39,000.

This is particularly true in this case since plaintiff acknowledged that defendants told him that "Although they had accounts payable and money due them, they could not come up with the cash to pay this, and they didn't want to have to dig into their bank or borrow money outside of this in order to build."

Plaintiff now contends that when viewed in the light of the negotiations (see *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641]) the application should read as an application for "a loan for $150,000 'or such other amount [*appropriate to meet the economic objectives of respondents*] as may be later mutually agreed upon.' " He asserts that the testimony of his builder demonstrates that the improvements could have been constructed for $116,000 to $120,000, and that therefore the $130,000 loan which he secured[5] was $10,000 in excess of what was contemplated by the agreement.

The testimony does not support plaintiff's position. The extrinsic evidence which was admitted without objection fails to show that the language of the contract, in the light of all the circumstances, is fairly susceptible of either one of the interpretations contended for. (See *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 40.) The circumstances are clear. Prior to the execution of the agreement plaintiff was insisting the improvements could be constructed for less than the defendants contemplated, and that it would be difficult to secure more than $130,000. The defendants insisted that $150,000 would be necessary. The agreement is definite on its face. The plaintiff was to secure $150,000 unless another amount was subsequently agreed upon. There is no ambiguity to be explained. (See *Martin* v. *Culver Enterprises, Inc., supra,* 239 Cal.App.2d 925, 927.) The procuring of $130,000, unless agreed upon by defendants as an adequate sum, was not a tender of performance under the agreement.

Plaintiff seeks to arrive at the same result under the principle that the defendants had a duty not to act arbitrarily or in

[5]According to the mortgage banker from whom plaintiff secured the application, the grant of a loan of $130,000 was dependent upon the borrower posting $1,300, and corroboration of the estimated loan value of the project by a formal appraisal. He stated that his firm "can deliver" on 90 to 95 percent of the applications processed. For purposes of examining plaintiff's argument it will be assumed that the evidence permits a finding that the sum of $130,000 was unconditionally available. Plaintiff stated the percentages paid the mortgage banker, or lender, would be deducted from his fee.

bad faith so as to defeat plaintiff's right to compensation under the contract. (See *Stromer* v. *Browning* (1966) 65 Cal.2d 421, 424 [55 Cal.Rptr. 18, 420 P.2d 730]; *Keystone Mortgage Co.* v. *MacDonald, supra,* 254 Cal.App.2d 808, 815; and *Colwell Co.* v. *Hubert* (1967) 248 Cal.App.2d 567, 575 [56 Cal.Rptr. 753].) He also asserts that the phrase "such amount as may be later mutually agreed upon" required the defendants to exercise good faith, or the standard of a reasonable person, in determining whether to accept or reject the lesser sum tendered by plaintiff. (See *Call* v. *Alcan Pacific Co.* (1967) 251 Cal.App.2d 442, 447 [59 Cal.Rptr. 763].) These arguments again presuppose that defendants were bound to accept such amount as plaintiff or his agents might determine to be the cost of the improvements, and were bound to delegate to plaintiff, over the objections of their architect, the selection of a nonlicensed builder to arrange for the construction of their building. Nor under the terms of the agreement were they bound to agree to any sum which nine jurors, the trial judge, or this court might subsequently believe was adequate to construct the building. The defendants were entitled to stand on the express terms of the agreement and withhold approval of a lesser sum, unless they personally believed it was adequate for their purpose.

As in *Stromer* v. *Browning, supra,* the broker was advised of the defendants' terms, and he could not require them to vary them merely so he could secure a commission. (See 65 Cal.2d at p. 428.) In *Keystone, supra,* the prospective borrower's inability to meet the prospective lender's conditions was without fault and the broker was denied recovery. (254 Cal. App.2d at p. 815.) In *Colwell Co.* v. *Hubert, supra,* the plaintiff secured a prospective lessee and the owner failed to conduct negotiations. (248 Cal.App.2d 567, 574-575.) There was no obligation on defendants to negotiate in this case until plaintiff produced a prospective loan in the sum of $150,000, or such other sum upon which defendants were willing to agree.

There is no substantial evidence to go to the jury on the theory that plaintiff had substantially performed by tendering a loan under the terms of the agreement. (*McCoy* v. *Zahn Corp., supra,* 183 Cal. 191, 197-199; *Keystone Mortgage Co.* v. *MacDonald, supra,* 254 Cal.App.2d 808, 815, and see *Stromer* v. *Browning, supra,* 65 Cal.2d 421, 424; *Wilson* v. *Roppolo* (1962) 207 Cal.App.2d 276, 280 [24 Cal.Rptr. 437]; *Tetrick* v. *Sloan* (1959) 170 Cal.App.2d 540, 545 [339 P.2d

470

613]; and *Wilton* v. *Clarke* (1938) 27 Cal.App.2d 1, 4 [80 P.2d 141].)

*Repudiation and Revocation*

■ The defendants take the position that the plaintiff was the first to repudiate the agreement because he advised King that it would be impossible for him to secure a loan for $150,000. In this event the defendants would not have to await the expiration of the contract period before seeking elsewhere for the funds they desired. (See *Coleman* v. *Mora* (1968) 263 Cal.App.2d 137, 148-152 [69 Cal.Rptr. 166].) The evidence, however, permits conflicting findings on this issue, and, therefore, the directed verdict cannot be predicated on a finding that plaintiff repudiated the agreement.

It is unnecessary to determine whether defendants' negotiations with others which culminated in the May 11, 1965 brokerage agreement with Hicok & Company constituted such an interference with the rights of plaintiff under the earlier agreement as to amount to an anticipatory breach. The letter of May 14, 1965 which recites, "I have sought and obtained financing elsewhere" clearly indicated that the defendants did not intend to further perform the contract with plaintiff. (*Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 29 [142 P.2d 22]; *Thornton* v. *Victor Meat Co.* (1968) 260 Cal. App.2d 452, 476-477 [67 Cal.Rptr. 887]; *Nemanick* v. *Christensen* (1948) 87 Cal.App.2d 844, 846-847 [197 P.2d 785]; and cf. *Salot* v. *Wershow* (1958) 157 Cal.App.2d 352, 357 [320 P.2d 926]; *Hertz Driv-Ur-Self Stations, Inc.* v. *Schenley Distilleries Corp.* (1953) 119 Cal.App.2d 754, 760 [260 P.2d 93]; *Wilton* v. *Clarke, supra*, 27 Cal.App.2d 1, 4: and *California Canning Peach Growers* v. *Harris* (1928) 91 Cal.App. 654, 656-657 [267 P. 572].)

It must be assumed, for the purposes of reviewing the directed verdict, that the conflicting evidence would be resolved in favor of a finding that the plaintiff was not himself in default at that time. The question involves the nature of plaintiff's rights upon the defendants' repudiation.

Plaintiff, in reliance upon principles which have been developed and applied in connection with contracts giving an exclusive agency, or an exclusive right to sell or lease real property,[6] contends that he is entitled to damages measured

---

[6] An agreement which gives an exclusive right to a broker for a fixed period of time must be distinguished from a general, nonexclusive listing agreement. (See Comment, *The Right of a Real Estate Broker to a Commission in California* (1961) 8 U.C.L.A. L.Rev. 152 at pp. 162-165.)

by the commissions set forth in the contract. The trial court in granting the defendants' motion for, a directed verdict observed, "Now, assuming that Dr. King, . . . repudiated or terminated the contract . . . May 14th, 1965, he still had approximately 16 days to go. But in that period—or never did the plaintiff in this case ever come up with an offer to the defendants to comply with the contract. In other words, here you have a hundred fifty thousand dollars; the action terminated; refusal by the defendants to accept the hundred and thirty, so that in the period between that time and May 30th, I would say that, had they come up—it was still within the terms of the contract—and said, 'Yes, we have a hundred fifty thousand dollars; we are entitled to our money.' That didn't happen. All we have before us is that the contract says: '$150,000 or as may be later mutually agreed upon.' That is all we have. And, obviously, the plaintiff in this case was unable to perform. . . ."

An examination of the applicable authorities reflects that the judge may have overstated the case. The plaintiff would be relieved of further performance or tender of performance by defendants' breach. Nevertheless, he is not thereby relieved of proof of his damages. In the absence of any evidence to show that plaintiff could have earned his commission but for defendants' repudiation, the court properly directed a verdict for the defendants.

It is assumed, without determining, that the language "Otto E. Never is hereby authorized the exclusive right to

---

"Exclusive listing agreements are of two types. [Citation.] An 'exclusive agency' agreement is interpreted as prohibiting the owner from selling the property through the agency of another broker during the listing period [citation], but the owner may sell the property through his own efforts. [Citations.] However, an 'exclusive right to sell' agreement (exclusive sales contract) prohibits the owner from selling both personally [citations] and through another broker [citation], without incurring liability for a commission to the original broker. [Citations.] In the event the owner breaches this type of agreement, he is liable for the commission which would have accrued if the broker had procured a purchaser during the period of the listing. [Citation.] The broker need not show that he could have performed by tendering a satisfactory buyer [citation], or that he was the procuring cause of the sale. [Citation.] The owner may breach the agreement by negotiating a sale in violation of the agreement [citation] or by action which renders the broker's performance impossible. [Citation.]" (*Carlsen* v. *Zane* (1968) 261 Cal. App.2d 399, 401-402 [67 Cal.Rptr. 747]. See also *Coleman* v. *Mora* (1968) 263 Cal.App.2d 137, 145-146 [69 Cal.Rptr. 166]; *Rankin* v. *Miller* (1960) 179 Cal.App.2d 133, 135 [3 Cal.Rptr. 496]; *Tetrick* v. *Sloan* (1959) 170 Cal.App.2d 540, 546-547 [339 P.2d 613]; *Delbon* v. *Brazil* (1955) 134 Cal.App.2d 461, 464 [285 P.2d 710]; *Walter* v. *Libby* (1945) 72 Cal.App.2d 138, 141-142 [164 P.2d 21]; and *Maze* v. *Gordon* (1892) 96 Cal. 61, 66-67 [30 P. 962].)

negotiate the above-mentioned loan until May 30, 1965" is to be equated with an exclusive right to sell (see fn. 6 above); and, therefore, that the owners had no right to negotiate on their own behalf.

The defendants' repudiation would relieve plaintiff of further performance or tender of performance. In *Baumgartner* v. *Meek* (1954) 126 Cal.App.2d 505 [272 P.2d 552] the property was withdrawn from sale in violation of an exclusive and irrevocable listing for a fixed term. In response to the contention that the broker should have continued her efforts to find a purchaser, the court observed: "It appears to be appellants' [owners'] view that because they had no legal right to withdraw the property from sale, respondent therefore had the legal right to continue her efforts to find a purchaser and was required to do so before she could recover. As stated in *Rucker* v. *Hall, supra,* [105 Cal. 425 (38 P. 962)] the withdrawal 'placed it out of her power to complete' a sale. If appellants' contentions in this respect are correct the respondent would have been required to spend additional money and time trying to find a buyer who could not have viewed the property without permission of the owner. Respondent would also have been required, in order to interest such a buyer at all, to misrepresent her position in the matter, or, what is equally as bad, to persuade a prospective buyer to enter into an agreement which she knew would not be honored by the seller, and all this for the sole purpose of placing herself in a position to collect a commission and not with the hope of making a sale. The law does not demand such absurdities or sanction such questionable practices." (126 Cal.App.2d at pp. 511-512. See also *Thomas* v. *Lavery* (1932) 215 Cal. 675, 678, 681 [12 P.2d 636]; and *Alderson* v. *Houston* (1908) 154 Cal. 1, 10 [96 P. 884]; and, generally, Civ. Code, §§ 1440, 1511 and 1515; *Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, 33; *Thornton* v. *Victor Meat Co., supra,* 260 Cal.App.2d 452, 476; *California Canning Peach Growers* v. *Harris, supra,* 91 Cal.App. 654, 656; and Corbin on Contracts (1951) §§ 975 and 977, pp. 916-918 and 920-924.)

It has been generally stated, "The damages awarded in cases where exclusive and special agreements have been breached are usually the full commissions." (Comment, *The Right of a Real Estate Broker to a Commission in California* (1961) 8 U.C.L.A. L.Rev. 152, 165.) An examination of cases where the broker has recovered a commission reveals that the

damages are generally established by another sale made by the owner, or by the express terms of the agency agreement.

In *Fleming* v. *Dolfin* (1931) 214 Cal. 269 [4 P.2d 776, 78 A.L.R. 585], the court ruled, "It is further contended that irrespective of any fault of defendant, plaintiffs cannot recover in the absence of a showing that they had a purchaser ready, able and willing to buy. This assumes, of course, that the action was brought to recover an earned commission. Such was not the nature of this action, which seeks damages for breach of an exclusive agency contract. Plaintiffs were entitled to the exclusive right to contract for the sale of the property during the period specified, and the sale by [another agent] before the conclusion of that period destroyed that right and made performance by them impossible. Upon this breach by defendant plaintiffs were entitled to sue for the benefits they might have received under it, namely, the agreed commission. (See *Justy* v. *Erro* [1911] 16 Cal.App. 519, 531 . . . ; *Kimmell* v. *Skelly* [1900] 130 Cal. 555 . . . ; *Gregory* v. *Bonney* [1902] 135 Cal. 589 . . . ; 9 C.J. 622.)" (214 Cal. at p. 271. See also *Lowe* v. *Lloyd* (1949) 93 Cal.App.2d 684, 686 [209 P.2d 851]; and *Wright* v. *Vernon* (1947) 81 Cal. App.2d 346, 347 [183 P.2d 908].) In *Fleming* the unauthorized sale established that the land could be sold at a price agreeable to the owner, and the actual price which was received established a basis for the commission.

In each of the cases relied upon in *Fleming,* there was also an actual sale. In *Justy* v. *Erro* (1911) 16 Cal.App. 519 [117 P. 575] the controversy revolved about the question of whether the procuring agent was in fact an agent of the contracting brokers. The court found that this was immaterial if the sale was made during the life of the agreement. (16 Cal. App. at p. 531.)

In *Kimmell* v. *Skelly* (1900) 130 Cal. 555 [62 P. 1067] the contract expressly provided, "I agree to pay to said [agents], in the event of the sale of said real property by them or by anyone else, including myself, while this contract is in force [a fixed sum] as and for their compensation hereunder." (130 Cal. at p. 558.) The court ruled, "It is claimed that the brokers' contract was one to find a purchaser, and, no purchaser having been found, no commissions are earned, and that for this reason the complaint does not state a cause of action. The contract in this case is not the ordinary broker's contract; it is more. By its terms the brokers were entitled to two thousand two hundred and fifty dollars if during the life

474

of the instrument they found a purchaser; or if during its life defendant sold the property, they were likewise entitled to the same amount. Defendant having sold the property during the life of the contract, this last provision is relied upon to support a recovery, and justly so. The defendant made a contract and had the power to make it; and there is no reason why she should be allowed to escape from its binding force, unless equitable grounds exist which excuse her. The parties to a brokers' contract are at liberty to make the compensation of the broker depend upon any lawful conditions they see fit to place therein. The single question is, What does the contract provide?'' (130 Cal. at p. 559.) *Gregory* v. *Bonney* (1902) 135 Cal. 589, 592 [67 P. 1038] is to the same effect. (See also *Shainwald, Buckbee & Co.* v. *Cady* (1891) 92 Cal. 83, 85 [28 P. 101]; *Walter* v. *Libby* (1945) 72 Cal.App.2d 138, 141-142 and 144 [164 P.2d 21].)

No similar provision is found in the contract in this case. The only contingency expressly mentioned reads, ''It is further agreed that if [plaintiff] is unable to complete said financing through failure of the undersigned to properly execute the necessary papers, that the undersigned will pay [plaintiff], on demand, the above fee and all expenses incurred by him as above provided.'' Since, as has been noted above, there was no tender of performance in accordance with the express terms of the agreement, plaintiff cannot recover on this clause.

Cases, such as *Leonard* v. *Fallas* (1959) 51 Cal.2d 649 [335 P.2d 665], in which the owner couples an exclusive right to sell with an express promise to pay a commission ''if sold within 90 days after its termination to anyone whose name is registered with me in writing as of the termination date'' (51 Cal.2d at p. 651), do not assist plaintiff. No such agreement was made, nor do the facts show that the defendants secured financing with anyone produced by plaintiff. (See also *Delbon* v. *Brazil* (1955) 134 Cal.App.2d 461, 464 [285 P.2d 710]; and *Mills* v. *Hunter* (1951) 103 Cal.App.2d 352, 357-359 [229 P.2d 456].)

Several cases have dealt with clauses where the owner has agreed to pay a commission in the event the property is withdrawn from sale. (See *Maze* v. *Gordon* (1892) 96 Cal. 61, 64 [30 P. 962]; *Crane* v. *McCormick* (1891) 92 Cal. 176, 179 [28 P. 222]; *Carlsen* v. *Zane* (1968) 261 Cal.App.2d 399, 401 [67 Cal.Rptr. 747]; and *Baumgartner* v. *Meek, supra,* 126 Cal. App.2d 505, 506.) On the basis of such precedents it has been

stated, "Under a contract worded as is the 'exclusive' here, the broker is entitled to a commission when the owner, in derogation of the broker's rights, takes the property off the market . . ." (*Coleman* v. *Mora* (1968) 263 Cal.App.2d 137, 145 [69 Cal.Rptr. 166].)

The cases do not demonstrate such an unqualified right. In *Crane* v. *McCormick, supra,* the owner exchanged the property during the term of the contract, the court ruled, "In this case, the sale or exchange of the land by defendants themselves put it beyond the power of [the agents] to thereafter make a sale, and according to the express terms of the contract, this entitled them, upon proof of performance on their part, to the same commissions they would have earned if they had sold the land for *the amount realized by the owners.* [Citations.]" (92 Cal. at p. 182, italics added.)

In *Maze* v. *Gordon, supra,* the court sustained findings in favor of the owner to the effect he had not ratified a sale made by the agent on terms which differed materially from those authorized in the broker's contract. (96 Cal. at pp. 65-66.) The judgment for the owner was reversed, however, because the uncontradicted evidence showed that the property had been withdrawn from sale. The court stated, "It was not essential to make out plaintiff's case that he should have found a purchaser. By the terms of the employment, commissions became due 'in the event of withdrawing the sale of said property during the time.' The claim to compensation under this provision of the contract is not, as respondent suggests, as damages for a breach of the contract in withdrawing the land from sale. This [the owner] had a right to do, and in such event, he became indebted to plaintiff for his commissions." (*Id.* pp. 66-67.)

In *Baumgartner* v. *Meek, supra,* similar contract provisions were enforced, and the broker was awarded the full commission on the price set forth in the brokerage agreement, over the contention that the contractual provision was void as a penalty or a prohibited provision for liquidated damages. (126 Cal. at p. 512.) No proof was offered as to any other sale or exchange, nor was any showing made as to market value of the property at the time it was withdrawn from sale.

In *Carlsen* v. *Zane, supra,* the court stated, "The damages awarded in cases where exclusive broker agreements have been breached may be the full commission provided in the listing agreement where the property is withdrawn from sale by the owner's action." (261 Cal.App.2d at p. 402.) The issue in

that case was, however, whether the broker could recover a commission "under an 'exclusive right to sell' agreement where the owner sells the real property to a third party during the term of the agreement as a result of his own efforts and the broker is not the procuring cause of the sale." (*Id.* p. 401.)

The cases which tend to support plaintiff's position (*Maze v. Gordon, supra;* and *Baumgartner v. Meek, supra*) are distinguishable from this case because in each case there was an express agreement to pay the stipulated commission if the property were withdrawn from sale. Any attempt to apply the same measure of damages in the absence of an express agreement runs counter to general rules governing the amount of damages recoverable for anticipatory breach of a contract, and conflicts with the measure of damages generally applied when there is a breach of a brokerage contract by a sale or exchange affected through other than the agent with the exclusive right to sell.

In *Carlsen v. Zane, supra,* the agreement provided, "that the 'owner agrees to pay [the brokers] said percent of the list price if owner withdraws said property from sale . . . or otherwise prevents performance hereunder by [the brokers] during the said period of [the] agreement regardless of whether a buyer was or was not obtained.' " The owner sold 10 of the 15 acres, which were the subject of the agreement, at a price appreciably less than the sum contemplated in the agreement. The court in reversing a judgment for the owner, and upholding the right of the broker to a commission, ruled " . . . upon retrial the court must limit plaintiffs' recovery of a broker's commission to the selling price secured by the defendants . . . for the 10-acre parcel." (*Id.* at p. 403.)

An examination of other cases involving breach of a brokerage contract reveals that the commission lost is generally measured by the consideration received by the owner in sale or exchange, rather than by the amount fixed in the agreement. (See *Gregory v. Bonney* (1902) 135 Cal. 589, 592-593 [67 P. 1038]; *Crane v. McCormick, supra,* 92 Cal. 176, 182; *Colwell Co. v. Hubert, supra,* 248 Cal.App.2d 567, 583; *Wilson v. Roppolo, supra,* 207 Cal.App.2d 276, 283; *Delbon v. Brazil, supra,* 134 Cal.App.2d 461, 464; *Mills v. Hunter, supra,* 103 Cal.App.2d 352, 360; *Wright v. Vernon, supra,* 81 Cal.App.2d 346, 347; and *Walter v. Libby, supra,* 72 Cal.App.2d 138, 141; but cf. *Lowe v. Lloyd, supra,* 93 Cal.App.2d 684 [exchange without proof of value], and *Justy v. Erro, supra,* 16 Cal.

App. 519, 527 and 531 [fixed by offer submitted through agent].)

In *Alderson* v. *Houston, supra,* the court reversed a judgment for the defendant owner, and ruled, ''The refusal of the defendant to clear the lots of the liens effectually prevented the plaintiffs from completing the making of the sales above mentioned and also from the performance of their part of the contract.'' (154 Cal. at p. 13.) The opinion further states, ''As the case must be reversed for a new trial, it is proper to discuss the question of the measure of damages. The rule applicable to such breach of contract is stated generally in section 3300 of the Civil Code whereby the damages allowed are said to be 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom.' There are a few cases, involving the future performance of a broken contract, wherein it has been held that the possibility that the plaintiff would have been able to perform if he had not been prevented, was, from the nature of the undertaking, so remote and speculative that the contract price for full performance could not be allowed as damages. Contracts of agency to sell goods in unlimited quantities on commission have been held to be in this class. [Citations.] These, however, are exceptions. The general rule is thus stated in 1 Sutherland on Damages, § 121: 'The decided cases which relate to prospective damages warrant the statement that the injured party is entitled to recover compensation for such elements of damage as are likely to occur; the jury may proceed upon reasonable probabilities, and accept as sufficiently proved those results which, under like circumstances, generally come to pass. It is not, however, to be hence inferred that prospective damages may be recovered on every plausible anticipation, nor that no allowance is to be made for the uncertainties which affect all conclusions depending on future events; it is only intended that such uncertainties, where the damages are shown by evidence reasonably certain, do not exclude them wholly from consideration.' . . .

''There was uncontradicted evidence in the case at bar showing that it was extremely probable that plaintiffs could and would have sold all the lots within the time limited in the contract, if the defendant had been willing to clear the title. It was amply sufficient to support a finding to that effect. The court below made no finding on the point, being evidently of the opinion that no finding was required, inasmuch as it con-

cluded that there had been no prevention of performance. The question whether or not the contract could have been performed was a question of fact to be determined from the evidence, in case the court had concluded that the defendant was liable." (*Id.* pp. 15 and 16. See also *Thomas* v. *Lavery, supra,* 215 Cal. 675, 681-683; *Vitagraph, Inc.* v. *Liberty Theatres Co.* (1925) 197 Cal. 694, 700-701 [242 P. 709]; *Parke* v. *Frank* (1888) 75 Cal. 364, 369-370 [17 P. 427]; *Miller* v. *Lerdo Land Co.* (1921) 52 Cal.App. 662, 686-693 [199 P. 1073]; and Corbin on Contracts, *supra,* § 978, pp. 924 et seq.)

In *Baumgartner* v. *Meek, supra,* the court upheld an express provision that the commission be paid if the property were withdrawn from sale against attack on the grounds that it was void as either a penalty or a provision for liquidated damages. (126 Cal.App.2d at pp. 512-513.) As has been noted, this conclusion is consistent with *Maze* v. *Gordon, supra,* 96 Cal. 61, 66-67, and has been noted, without question, in *Coleman* v. *Mora, supra,* 263 Cal.App.2d 137, 145 and *Carlsen* v. *Zane, supra,* 261 Cal.App.2d 399, 402-403. Nevertheless, the decision is rested on cases[7] in which the fact that the commission would have been earned was established by an actual sale of the property in derogation of the agent's rights. In the absence of such a sale, or some evidence to show that the property could have been sold at a price contemplated by the agency agreement, the promise to pay the commission results in damages which may exceed those contemplated by section 3300 of the Civil Code,[8] and must pass muster under the tests prescribed in sections 1670 and 1671[9] of the same code. (See *Caplan* v. *Schroeder* (1961) 56 Cal.2d 515, 519-521 [15 Cal. Rptr. 145, 364 P.2d 321].) It is unnecessary to reexamine

---

[7]*Fleming* v. *Dolfin* (1931) 214 Cal. 269, 271 [4 P.2d 776, 78 A.L.R. 585]; *Kimmell* v. *Skelly* (1900) 130 Cal. 555, 559-561 [62 P. 1067]; *Mills* v. *Hunter* (1951) 103 Cal.App.2d 352, 360 [229 P.2d 456]; *Walter* v. *Libby, supra,* 72 Cal.App.2d 138, 142.

[8]Civil Code section 3300 provides: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

[9]Civil Code section 1670 provides: "Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section."

Civil Code section 1671 provides: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

*Baumgartner* v. *Meek* in this light because in this case there was no express promise to pay a commission if the prospective borrower decided to forego obtaining a loan. A statement of the problem, however, indicates that this court, in the absence of such an agreement, should hesitate to award damages which the proof fails to show were either commensurate with the detriment proximately caused by defendants' breach, or were likely to result from such breach. (See Civ. Code, § 3300, fn. 8 above.)

The cases reviewed indicate that the express or implied promise of the broker to use his best efforts to effect a sale—or in this case, a loan—is sufficient consideration to support the exclusiveness of the agency, and also any collateral promise to pay a commission on a contingency developing because of the action or inaction of the owner. (See *Sill* v. *Ceschi* (1914) 167 Cal. 698, 702 [140 P. 949] ; *Ruess* v. *Baron* (1932) 217 Cal. 83, 85 [17 P.2d 119] ; *Roth* v. *Moeller* (1921) 185 Cal. 415, 420 [197 P. 62] ; *Alderson* v. *Houston, supra,* 154 Cal. 1, 14; *Kimmel* v. *Skelly, supra,* 130 Cal. 555, 559-561; *Crane* v. *McCormick, supra,* 92 Cal. 176, 182; *Coleman* v. *Mora, supra,* 263 Cal.App.2d 137, 146-149; *Tetrick* v. *Sloan, supra,* 170 Cal. App.2d 540, 547; and *Baumgartner* v. *Meek, supra,* 126 Cal. App.2d 505, 508-511.) In the instant case there is no collateral promise other than that analyzed above as inapplicable. Although plaintiff's acknowledged efforts and expenses furnished consideration for the obligation assumed by defendants, they furnish no grounds for recovery. The defendants only bound themselves to pay if a $150,000 loan was obtained. There is no evidence that such a loan was or ever could have been obtained. From all that appears in the record, plaintiff undertook the impossible. Under these circumstances his performance was not prevented by defendants' breach, and no damages flowing from that breach have been established. The trial court properly directed a verdict for the defendants.

The judgment is affirmed.

Elkington, J., concurred.